UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

UNITED STATES OF AMERICA,

Plaintiffs,

Case No. 8:07-CR-170-SCB-MSS
4 June 2008
Tampa, Florida
10:20 a.m.

-vs-

PAUL F. LITTLE,
a/k/a "Max Hardcore"
a/k/a "Max Steiner," and
MAX WORLD ENTERTAINMENT, INC.,

Defendants.
________________________________/

EXCERPT OF TRANSCRIPT OF TRIAL PROCEEDINGS
BEFORE THE HONORABLE SUSAN C. BUCKLEW,
UNITED STATES DISTRICT COURT JUDGE
(CLOSING ARGUMENTS OF COUNSEL)

APPEARANCES:

For the Government: LISAMARIE FREITAS, ESQUIRE
EDWARD J. McANDREW, ESQUIRE
U. S. Department of Justice
Criminal Division
Child Exploitation and Obscenity Section
1400 New York Avenue N.W.
Washington, D.C. 20530

For the Defendant Paul F. Little: JEFFREY J. DOUGLAS, ESQUIRE
Law Office of Jeffrey J. Douglas
1717 Fourth Street, Third Floor
Santa Monica, California 90401
(310) 576-3411

For the Defendants Paul F. Little and Max World Entertainment, INC.: JAMES S. BENJAMIN, ESQUIRE
DANIEL AARONSON, ESQUIRE
Benjamin & Aaronson, P.A.

One Financial Plaza, Suite 1615
Fort Lauderdale, Florida 33394
(954) 779-1700

For the Defendant
Max World Entertainment
Inc.: H. LOUIS SIRKIN, ESQUIRE
JENNIFER M. KINSLEY, ESQUIRE
Sirkin, Pinales & Schwartz LLP
105 West Fourth Street, Suite 920
Cincinnati, Ohio 45202
(513) 721-4876

Reported By: PAUL K. SPANGLER, RPR,
Official Court Reporter
Certificates of Merit and
Proficiency, Notary Public
(813) 301-5898

STENOGRAPHICALLY RECORDED
COMPUTER-AIDED TRANSCRIPTION
BY ECLIPSE

(10:20 a.m.) P R O C E E D I N G S

* * * * *

MR. McANDREW: Thank you, Your Honor.

(Pause)

I'm going to turn this a little bit. Is that okay?

THE COURT: Sure.

MR. McANDREW: When Leida comes back I'm going to ask her to dim the lights, because we're going to use the --

THE COURT: I can do that.

MR. McANDREW: Oh, okay.

THE COURT: I'll take care of that.

(Pause.)

MR. McANDREW: Good morning, ladies and gentlemen.

THE JURORS: Good morning.

MR. McANDREW: When we started last Wednesday, we told you that this was a case about extremes. More precisely, it's about how Paul Little and the company that he owns, Max World Entertainment, used the internet to distribute for profit some of the most extreme sex videos available.

Last Wednesday morning you had not seen over nine hours of those acts played out on that large screen in this courtroom. You probably had never seen anything like that before. But now you've seen it for yourselves. You don't

have to take anyone else's word for what's in it; you know what you saw, and you know how it made you feel.

There are many different types of trials that are difficult for their own reasons. There are cases where jurors must look at images of murder scenes, mutilated bodies, child pornography. But few have had to do what you all had to do for the past week. And we thank you for your patience, your sacrifice and your commitment to this case.

Watching these videos was legally necessary, but tough to stomach for almost everybody in this courtroom. These videos are not just offensive, but they literally assault your senses. The sights and the sounds are overpowering. They bludgeon you to the point of exhaustion. And they seem to go on forever, repeating the same conduct over and over and over again.

Were you not sitting here as jurors, required by law to watch this material, no one could blame you for running to the exit. But it was important that you watched it. It was important because it is for you and you alone to decide whether these depictions are acceptable in your community.

You had to endure these videos for one reason, and one reason only, because Paul Little and his company made them and distributed them. If Paul Little doesn't make and sell these videos, we're not here. And Paul Little

shouldn't get a pass because his videos are disgusting to watch. Justice demands that he be held accountable.

We also told you at the outset that we were not here to attack the adult entertainment industry. Now, you've seen the evidence, and you know that to be true. In fact, you might quite reasonably conclude that Mr. Max Hardcore gives legal adult entertainment a bad name.

We're not talking about what goes on in the legal adult establishments in Tampa; and we're not talking about what people do in the privacy of their own homes. We're not here to talk about what consenting adults can or cannot do, because the First Amendment does not protect obscenity. Period. There is no First Amendment right at stake in this case.

So again, let me be clear. We're here because Paul Little made these movies for the purpose of distributing them. And under the law and the evidence he's responsible for distributing them. That is the one and only reason why we're here.

So, your job today and -- and in the coming days, uh, is thus limited to determining whether the five internet video trailers and the five DVDs charged in the Indictment violate the Federal obscenity statutes that the Judge just instructed you on.

The evidence of these violations is overwhelming,

and let's now talk about the substantive counts. I want to talk first about the evidence proving the first five counts. That is that Paul Little used his website to distribute the trailer videos, as we've called them, charged in those counts.

Now, you can find Mr. Little and his company guilty of violating Title 18, United States Code, Section 1465 because they knowingly used a facility or means of interstate commerce or an interactive computer service to transport the files containing the video clips.

They did transport these files for the purpose of selling or distributing them. They knew at the time the general sexual nature of the content. They didn't have to know that it was obscene, but they had to know the general sexual nature.

And finally, you need to make a determination as to whether they are obscene.

Now, a facility or means of interstate commerce includes the use of an internet -- of the internet. An interactive computer service includes a website attached to the internet.

So, let's go through the evidence that shows that Paul Little and his company distributed video clips or trailers charged in Count One through Five.

There can be no doubt that Paul Little and his

company knowingly distributed these videos clips. Paul Little, in the fullest sense of the phrase, is all over the evidence.

He wasn't making these videos for his own personal collection, and he's not just the producer. He is the unquestioned male star of each one. These videos are all about him. His face and his name are also all over the website where he advertises these videos for sale.

But why is Max World Entertainment a defendant? As Judge Bucklew just explained, the corporation can be held liable for the acts committed by its officers, directors, employees or agents.

Paul Little is the president, secretary-treasurer and only director of Max World Entertainment. Paul Little is Max World Entertainment. He owns it; he's the contact person on all the corporate documents; he controls its bank accounts.

Now, I'm going to show you some slides today, and I would like to start first with what we've marked -- well, what is in evidence as Exhibit 25. These are the Articles of Incorporation of Max World Entertainment. We didn't discuss these during the trial because the parties agreed to just move these into evidence. But you can certainly consider them like any other piece of evidence in the case.

These Articles show you, uh, that Paul Little is

the only director of the company.

The next is Exhibit 32B. This is a document that was submitted to his bank, or Max World Entertainment's bank, Wells Fargo, in order to open an account. This is a list of the corporate officers of Max World Entertainment.

And as you look at the names, you'll see only Paul Little's name next to president, secretary, treasurer, director.

This next document is a Los Angeles, uh, tax certificate for Max World Entertainment, Inc. It lists Mr. Little's name, and it lists the company as being located as 1333 Pleasant Ridge Drive, Altadena, California.

Sorry. There it is.

And this is a bank account statement for Max World Entertainment, Inc. It lists that same address.

Now, why do we keep coming back to this address during the trial? It's because that's where almost everything takes place in this case. It's where Paul Little lives. It's where he films many of his scenes. It's where he runs his business.

You saw countless pictures of the house during the DVDs. You saw the yellow couch over and over and over again. Detective Kyle Lewison from the Los Angeles Police Department told you that he's been in the house, and he recognizes it from the DVDs.

You have pictures of the house that Detective Lewison identified for you. And they're Exhibit 40.

Remember this scene? This was Desire from Fists of Fury 4, uh, where Mr. Little was stocking his DVDs in the garage when this girl, posing as a teenager, comes skating up and tells him that she wants to be a model.

That's Mr. Little's garage.

There are his DVDs.

What are these trailers that are charged in Counts One through Five? They're promotional clips for the five DVDs that are charged in Counts Six through Ten. These are designed to entice you to buy the full-length DVDs.

And Max World Entertainment and Mr. Little distribute them directly from the maxworld.com -- maxhardcore.com website.

You heard from Jim Fottrell, uh, from the Department of Justice's high tech investigative unit. Based on his testimony you probably concluded that Jim knows computers pretty well. Uh, he knows where the internet is, he knows where it goes, and he knows how to get from point A to point B on it.

Jim walked through some of the nuts and bolts of the commercial website. He told you a bunch of things that you probably already knew, but hopefully some things that

you didn't know.

Uh, he talked about domain names, registrars, hosting companies and trace routes. He talked about how he captured or recorded the maxhardcore.com website in January of 2006.

He walked you through the site, and it's on a black hard drive that's marked Exhibit 3A. You'll have printouts in the jury room of that website and the various clips that Jim took you through. Those are Exhibits 3B through 3-I.

This is the first page of the site you probably recognize. And as Jim walked you through these parts of the site, it became clear that Mr. Little and his company control it.

(Pause)

There's Mr. Little's Max Hardcore biography on the site. I would encourage you to read that.

Now, it's clear from the site and the way that the videos are advertised that they're being advertised for sale. "Preview my latest updates here." It talks about Max's DVDs and videos on demand; it tells you what you get if you sign up for a membership to the site.

(Pause.)

It tells you how to sign up to be a member of the site. And one of the ways that you were able to sign up was

by using something called CCBill. And Jim showed you how you could do that on the site. There are exhibits in evidence at 14B through F. These are the CCBill records that relate to the Max World Entertainment account.

Uh, 14B is an account summary. It lists Mr. Little at his home phone and home address. It shows the website addresses.

14C is the contract between Max World Entertainment and CCBill, filled out by Mr. Little, signed by Mr. Little.

14D is the wire transfer authorization. That authorizes the money to be transferred into a Wells Fargo bank account under the name of Paul F. Little.

(Pause)

This document's a webmaster weekly report, 14E. It shows you how much money the websites were generating through memberships on a weekly basis over a two-week period. It's a very interesting document to take a look at.

You should compare these records to the -- to the, uh, bank records, the Max World Entertainment bank statements that show nearly weekly wire transfers into the account from CCBill.

You'll see Exhibit 32E. We've highlighted on this copy some of the CCBill account, uh, uh, transactions. And I believe transfer totals for one month, and that was in,

uh -- I can't remember what month that was -- but you'll have the document -- were $41,414.

Take a look, too, at Exhibit 3-I. This is the customer support page of the website. Uh, the phone number that's listed there rings in Mr. Little's house. There are the telephone records to prove it. We've moved those in, so you didn't see them during the course of the trial, but they're there for you to look at now.

Finally, the business records from Network Solutions, Inc. They tell you that the -- that the websites, the domain names are, in fact, registered to Max World Entertainment and paid for with Mr. Little's credit card.

Now, Jim Fottrell explained to you how he downloaded the trailers charged in Counts One through Five. Walked you through how someone who had a membership to the site could navigate these trailers and download them. Uh, and that's what he did. You saw each trailer on a disk in its entirety.

You have the printouts, as well, the steps he took to navigate to those trailers on the website. And those are Exhibits Five, Six, Seven, Eight and 9A and B.

Finally, Mr. Fottrell explained to you how he located that website physically. He ran a trace route on the website in January of 2006 to figure out where it was,

because things that are on the internet actually do have to physically exist somewhere.

And Exhibit Two is that trace route. It shows you, you can track the electronic transmission through the circuitry moving geographically across the United States, from Dallas up to Chicago, over to West Virginia, down to Atlanta, and finally down to a server in Tampa called Hostway.

You don't have to take Mr. Fottrell's word for it, though, or just rely on the trace route, because you heard from Charles Charmatz, the Tampa general manager of Hostway Corporation. It's a web hosting company that's located right around the corner from where you're sitting now.

He showed you the contract that Candid Hosting -- Candid is a wholly-owned subsidiary of Hostway -- had with Max World Entertainment. And this contract extended over a period of years.

It's Exhibit Ten, and you'll see that the contract again, like the other documents, is in Mr. Little's name and provides his home address and phone number. It provided for payments by check. Uh, and you have the payment history here running from March of 2003 to December of 2007.

During January of 2006 when Mr. Fottrell downloaded this website and these trailers and traced it to Tampa, Max World Entertainment paid Candid $3,000 by check

for web hosting services. And you'll find that in the documents.

Mr. Charmatz also told you that in January 2006 Candid only had one office. It was at 412 East Madison Street, I believe, right here in Tampa, literally around the corner.

He also showed you a picture of what a server room looks like there. These are where the websites physically exist on the internet. And he showed you information that could pinpoint exactly which computer the Max World website was on.

So, the Max World website wasn't off in some parallel universe that we think of as cyber space, it was sitting on a computer right around the corner from where you're sitting today.

And defense counsel may tell you that Paul Little never stepped foot in the office of that company; had no idea the server was in Tampa. Well, that's factually wrong, and it's legally irrelevant.

He used a website; he distributed video files across state lines for the purpose of selling them. He knew they were sexual in nature, and you're going to decide whether they are obscene. That's all that's necessary legally.

Factually, they had one office. It was in Tampa.

By January 2006 Mr. Little had been sending checks to that one office for nearly three years.

Does that add up to you that he wouldn't know where they were? This is a man who you might say was heavily involved in all aspects of his business. His website was his vehicle to the world.

Do you really believe that he had no idea where his website physically was, even though he knew where to send the checks to make sure it stayed there?

Based on all the evidence you have before you, ladies and gentlemen, we respectfully ask you to find Paul Little and Max World Entertainment guilty on Counts One through Five.

Now, let's talk about the DVDs that are charged in Counts Six through Ten. Excuse me. These counts charge Mr. Little and his company with causing five Max Hardcore DVDs to be distributed through the U.S. Mail.

You heard from Postal Inspector Linda Walker, who told you she went to maxhardcore.com in March of 2007. She was sitting in her office at 5102 West Laurel Street right here in Tampa when she did that.

She accessed that site, navigated to the movie series index, which is in the exhibits, uh, and clicked on the DVDs in issue, and was automatically redirected to the Jaded Video website where she bought three of the DVDs.

And you have the Camtasia capture where you literally watch her clicking through these pages to order the DVD. So, there's no guesswork there. You have it.

She also went to two other sites registered to and run by Max World Entertainment to make purchases. They were mentioned throughout the trial, but they aren't a real focus -- they haven't been a real focus of the testimony.

By typing the URL she went to catalinaxxx.com and pissedonpornstars.com. She bought one DVD from each of those sites. Those sites were controlled by Max World Entertainment, as well.

Now, Inspector Walker also testified that it wasn't possible for her to buy the DVDs from the Max World site because those sites automatically kicked her over to the Jaded site. Her testimony on that point is uncontroverted.

Once Linda Walker got to the payment page of the Jaded website for the five DVDs, she entered the shipping information and the payment information. And you'll have that as Exhibits 18, 19 and -- or 18, 20, 22.

She then made out money orders, and she sent them to Jaded. And you have those in evidence as Exhibits 19, 21 and 23.

She also told you she received three packages in the mail from Jaded containing the five DVDs she ordered.

They were delivered to a P. O. Box right here in Tampa. And you'll have those packages, as well. Those are the blue postal packages we all have been carrying around for the last week in the courtroom here.

Over the past week you've become intimately familiar with the contents of those DVDs, and I'm not going to belabor that point.

Based on this transaction you should find Paul Little and Max World Entertainment guilty of violating Title 18, United States Code, Section 1461. You can find them guilty because Mr. Little knowingly caused the DVDs to be delivered by mail.

And the Judge just told you in her instruction what that means. Mr. Little knew at the time of such mailing the general nature of the content of the DVDs. He knew they were sexual, he was in them. And you need to find that the DVDs were obscene.

Now, Mr. Little and his company caused the mails to be used because they took steps to set the distribution in motion, knowing that the use of mails would follow in the ordinary course of business.

He also could reasonably foresee that the DVDs would be shipped by mail to the customers of his website. There are only so many ways to get DVDs to people all over the place.

There is no question that these DVDs are commercial. Look at their cases. Look at the box art; look at the markings. It's the type of DVD in terms of the box and cover that you would get anywhere else.

But also look at, for instance, Golden Guzzlers Number 7. It has what's called a 2257 notice. This is a notice that lists Mr. Little as a records custodian. The Judge explained to you what that means, uh, the 2257 notice. It lists Max World Entertainment as the manufacturer.

Remember the intro segments to the video, uh, the DVDs -- and I think this is true all over -- where Mr. Little or Catalina would tell viewers out there that they shouldn't watch if -- if they were not of legal age in the -- whatever state they were in, or if it might offend their sensibilities, or if it offends shocking community standards.

Do you know anyone who has those sorts of notices on their home movies? There are ads or trailers for other Max Hardcore movies in each DVD. At the end they tell you to get it at maxhardcore.com or at jadedvideo.com. And there's no question whose website is at maxhardcore.com.

Now, the defense lawyers have pointed out that neither Mr. Little nor his company actually dropped the DVDs in the mail to Postal Inspector Walker. Jaded did that. Jaded mailed them, Jaded collected Linda Walker's money.

Those facts are undisputed.

(Pause)

So why are Paul Little and Max World Entertainment on trial for the mailing? Because they caused the delivery of the DVDs by way of mail. And under Section 1461 that's sufficient. They also aided and abetted the use of the mails to deliver these DVDs. And under something called 18, U.S.C., Section Two, which the Judge described for you, that's sufficient.

They are responsible because it was reasonably foreseeable that Jaded would use the mail to send these to the customers. Jaded wasn't buying these videos en mass for its own personal use. It was a distributor.

You can make a determination based on everything you've seen and heard in the case, including the fact that there are only so many ways to send something.

They are also charged with aiding and abetting Jaded's mailing of the DVDs. We said that. You may find Mr. Little and his company liable for aiding and abetting if you conclude that he and his company joined together with Jaded to distribute the videos through the mails to customers of the maxhardcore.com website.

That is, Paul Little and Mr. -- and Max World Entertainment are responsible for the mailing if they willfully participated in bringing it about, even if

they didn't do every single step in the process.

Now, you heard from Jim Komurek, the president of JKG, or Jaded -- we've been referring to it as Jaded -- about the distribution relationship between his company and Mr. Little, and Mr. Little's company. That relationship started in about 2001. It continues until this day.

Jim Komurek will not be prosecuted for the testimony he gave in this case. You heard about that, and you're going to have the immunity agreement in evidence. And I invite you to read it carefully, look at all the language and decide for yourself what you think it means.

Why did the Government agree to that? Because it's necessary to secure the testimony --

MS. KINSLEY: Objection, Your Honor, that's not in evidence.

THE COURT: Sustained.

MR. McANDREW: That agreement speaks for itself, and I'll let you read it, and I think you'll understand it.

It was important that you hear the truth, though, about the relationship between Jaded and Max World Entertainment, because the defense will try to convince you that Paul Little didn't know that Jaded planned to distribute these DVDs when he sold them to Jaded.

That claim is simply ridiculous. We needed Mr. Komurek's testimony to prove it. If you stop

Paul Little, you stop Max Hardcore. On the other hand, if you stop Jaded, Paul Little finds another distributor and goes on without missing --

MS. KINSLEY: Objection, Your Honor, this is going into the Government's motive and encouraging the jury to send a message which we discussed the -- the Government not doing.

THE COURT: I'm going to overrule the objection.

MR. McANDREW: I'll move on, Your Honor.

Mr. Komurek laid out the relationship between Jaded and Max World Entertainment, and he showed that Paul Little knew or could have reasonably foreseen that Jaded was going to ship the videos by mail.

He explained to you that his company is separate from Max World Entertainment and Mr. Little, they don't have intertwined interest in terms of ownership.

Jaded handles distribution for 99 percent of the adult studios in Los Angeles. It carries about 60,000 titles on its website, but it generally doesn't carry inventory, except for new releases.

It's a one-stop shopping place for lots of adult videos. It's an online vending machine, if you will. Mr. Komurek explained that other studio sites are linked into the Jaded site.

More particularly, he told you that the

maxhardcore.com website links into the Jaded site. Jaded does not link out to any other site.

Now, Jim Fottrell showed you what linking means when he was talking about CCBill. He showed you some source code where the Java scripts read CCBill.com. That's how one website links into another website.

Mr. Komurek also explained how his long-standing distribution relationship with Max World Entertainment worked. Jaded doesn't keep an inventory of Max Hardcore DVDs.

The way it works is that when the Max Hardcore site automatically directs a purchaser to Jaded, the purchaser completes the order form and submits a payment to Jaded.

Jaded's an online payment processor. Jim Fottrell talked to you about that, and how a lot of commercial websites outsource online payment processing.

Jaded then faxes a purchase order to Max World Entertainment. Max World Entertainment sends the order of DVDs to Jaded with an invoice, billing Jaded for the DVDs.

Jaded sends them to the customer, and then remits payment on the Max World Entertainment invoice to Max World Entertainment.

Jaded is a classic middle man between

Max World Entertainment and its customer; a middle man that can process online payments.

Mr. Komurek walked you through how orders made by Inspector Walker were processed in this case. You will recall, uh, Inspector Walker telling you she placed the orders on March 13th of 2007, on or about.

You saw that in the Camtasia capture. You have the confirmations that she received from Jaded telling you the date that the orders were placed. Let's trace the paper and money trail between Jaded and Max World Entertainment on the Walker transactions.

In Exhibit 23B you see Jaded's March 20th, '07 purchase order to Max World Entertainment for the DVDs ordered by Inspector Walker. They were shipped by UPS ground from Max World Entertainment at Mr. Little's home to Jaded's offices. And you see each of our DVDs listed on that purchase order.

In Exhibit 29B you have Max World Entertainment's March 21st, '07 invoice to Jaded that accompanied the DVDs that had been listed in the purchase order. It references the purchase order.

Max World Entertainment sold these DVDs to Jaded for $34 each. The total on that invoice was $2,556. But there was a hiccup in the transaction. Fists of Fury 4 was missing from the first package.

So -- now, Mr. Komurek explained Jaded's fill and kill policy he called it on purchase orders. They don't carry inventory, they don't do back orders. They just create another purchase order.

And that's what they did here. They created another purchase order and included Fists of Fury 4 on their new purchase order. Max World Entertainment responds by sending Fists of Fury 4 along with an invoice.

So Jaded receives the DVDs from Max World Entertainment from Mr. Little's house and shipped them to Linda Walker in Tampa. That's not the end of the transaction, though.

Let's walk through the Wells Fargo Bank records for Jaded and for Max World Entertainment and see how the transaction ends up.

In Exhibit 31B you'll see this is the JKG account statement for March of 2007. It shows a March 23rd deposit in the amount of $7,635.16. And Exhibit 31C -- this is the deposit slip. And with it the cancelled money orders from Linda Walker deposited into the Jaded account. The deposit amount is $7,635.16.

But the money flow does not stop at the Jaded bank account. Mr. Little still needs to be paid. So you have Exhibit 32D. That's Max World Entertainment bank account statement dated April of '07. It shows an

April 17th deposit in the amount of $43,499.35.

32C is the corresponding deposit slip, and that includes two checks from JKG, Inc. -- Jaded -- to Max World Entertainment. There's a signature on the back of those checks.

That, ladies and gentlemen, is where the money ends up when somebody buys a Max World Hardcore DVD. Based on this evidence there's no question that Paul Little knew, or could have reasonably foreseen his distributor, Jaded, was shipping the merchandise to the end user and using the mail to do it.

Now, soon you're going to retire to determine, among other things, the central question in the case, whether these videos are obscene. Judge Bucklew has described for you the Miller Standard, she's given you the blueprint, the instructions for doing that.

(Pause.)

Excuse me. The Miller Standard was crafted by the Supreme Court in the '70s. It holds that material is obscene if an average person applying contemporary community standards finds that the material, taken as a whole, appeals to a prurient interest.

What is a prurient interest?

Uh, ladies and gentlemen, I went to law school about 15 years ago. I'd never heard that word before I went

to law school. That is a word that only a Supreme Court Justice could use. But it has meaning. It means an appeal to a morbid, degrading and unhealthy -- or unhealthy interest in sex.

That's how you have to think of it.

It has to appeal to an interest in sex. That's the object. But then you have to apply the modifier. Is it a morbid, degrading or unhealthy interest in sex?

You've seen these videos, you can decide that question pretty easily.

Now, the second stage, the second prong. An average person applying contemporary community standards finds the material depicts sexual conduct in a patently offensive manner.

What is "patently offensive"? Well, first, what is sexual conduct? Sexual acts, as the Judge described them for you in the instructions, you know it when you see it. Uh, you must measure this by contemporary community standards, whether it so exceeds the generally accepted limits of public tolerance as to be clearly offensive.

That is for you to determine based on your experience as members of this community, and looking to what an average person in your community would likely conclude.

The third standard, a reasonable person viewing the material as a whole finds the material to lack

serious -- serious literary, artistic, political or scientific value.

Now, to start you off on this quest, look at the first page of the website, Exhibit 3B. Mr. Little's picture is right on it. And on the bottom you can see the references to the other website.

It includes here the following statement:

"It is forbidden to continue if the material may violate community standards." He knows the law, and he's assuming the risk.

It also includes a copyright notice saying that the material could not be distributed without the prior written consent of Max World Entertainment.

Look at Exhibit 3C. This is Max's biography.

Jim Fottrell read the right-hand column of this to you. Read the left. It tells you an awful lot about Mr. Little. Tells you he entered pornography in 1990. Tells you that when the Anal Adventures of Max Hardcore was released in 1992, quote, even in industry veterans were shocked and several distributors refused to carry the line."

In 1994 it tells you "Max, quote, shocked the establishment again with his cherry popper series, breaking new ground and old rules, portraying innocent young girls with pigtails and hairless, submitting to disgustingly vile treatment."

It also tells you that In 1995 Max created Hardcore Schoolgirls with even stronger and more unmerciful treatment of young things Max would pick up and sexually degrade. The series was so harsh that it was banned in the United States and Sweden in 1997.

It talks about the new and unique method of sexual treatment that Mr. Little has pioneered. You've seen them in the videos. You know what they are.

And it claims he's the only U.S. director to make a euro version of his movies where you get to see what you saw.

Combine this history with his statements in the videos. Look at the intro and listen to it, where he talks about how content might offend someone's sensibilities.

Listen to Catalina's intro where she talks about stuffy community standards. That should set the stage for your analysis of the material.

An average person applying contemporary community standards finds that the material taken as a whole appeals to the prurient interest. "Prurient interest," meaning morbid, degrading, unhealthy interest in sex.

Would the average person in Tampa find that these items appeal to a prurient interest in sex, an unhealthy or degrading interest in sex? That's the question.

Of course they would. The evidence speaks for

itself. You sat here and watched it all. You can make that determination.

You all have lived here for a long time. You know lots of people. You know what your views are, you know what other people's views are, and you can gauge that.

Now, the defense is going to try to confuse you about this standard. They're going to talk about deviant groups. You heard from Dr. Brannon on this. And they will argue that this material appeals to deviant groups, and you should only consider those groups when deciding a prurient interest prong.

Well, Judge Bucklew's instructed you on the law, and you have those instructions to take back with you. Read them over carefully. We just need to follow it. And you don't need to be confused about this.

The test is satisfied where the average person applying Tampa standards would find the DVDs and the clips to appeal to an unhealthy or degrading --

MS. KINSLEY: Objection, Your Honor, the standards are the Middle District of Florida, not Tampa.

THE COURT: Sustained.

MR. McANDREW: I apologize -- the Middle District of Florida.

You've watched the videos, and you don't need someone to tell you that it's not what you think you saw.

Although he was paid over $3,500 to come here and try to do that, Dr. Brannon's testimony really didn't add anything of value to your deliberations.

There's no question, it was intended to appeal to the sexual interest of people. And you can decide whether you think what you saw was a healthy one, or a degrading one.

Look to the standards of the average person in this area. Consider the most and the least sensitive, and consider everybody in between.

Now, Dr. Brannon merely told you that the groups exist that would like this material. He's never testified as an expert before on this subject, and he admitted on cross-examination that he talked to two people, one in a conference, and he consulted Wikipedia. That's the basis of his opinion. And he couldn't talk about the existence of these groups at all in this area. He's from Fort Lauderdale. He was talking about what he knows generally.

Is that your community?

Whether this material actually appealed to them, he had done no work on that subject, and he had nothing really to add for your deliberations on that.

To say that there are those who like this type of behavior just doesn't advance the ball. He talked about

philias, different types of philias. Uh, he talked about pedophilia on cross-examination as a recognized sexual deviance, and how he testifies -- or how works on behalf of assessing the risk of danger that sex offenders pose to the community.

Well, pedophilia is recognized as sexual deviance. Child pornography depicts acts of sex involving children. Child pornography is illegal. Just because somebody has a philia doesn't mean that they can legally look at stuff dealing with it.

Just because a group exists doesn't mean that the material that is targeted to it is legal. And just because they're looking at it, and they like it, doesn't mean it's healthy, and it doesn't mean it's not degrading, and it doesn't mean it's not morbid.

Community standards. Remember that what might be acceptable in other places may not be acceptable here. You can draw on your own experiences and knowledge in this area, and that of your fellow citizens, to decide whether the average person in Tampa would find this material acceptable or not.

THE COURT: Not in Tampa.

MR. McANDREW: I'm sorry, I keep saying "Tampa."

I mean in the Middle District of Florida.

Tolerance is an issue the defense will raise.

It's relevant whether the community would tolerate these things, but it's not the true test. Tolerance, by its very definition, is a deviation from a standard.

You are to apply community standards. What is acceptable. If you were to just simply look at what's tolerated, you're dealing with the lowest common denominator.

That's not the test.

You have to look at the work as a whole. You have to ask yourself what's the dominant theme and the purpose of it? Not individual clips, but the whole thing overall.

What does it really represent?

You've seen the videos, you know what the dominant themes are of these videos. Mr. Little degrades and mistreats, humiliates women for crass, commercial gain and his own personal pleasure.

Max Extreme 20. You saw the sage in Valerie Jo clip, the woman in the wed -- red dress. Uh, and after he was through, he said, you look better with puke on your face.

Is this acceptable in your community? Or does it go too far?

Do copyright notices and intros redeem the rest of this? Do they provide value?

In a number of places on the website and in the

videos Mr. Little and others remarked that this is acting, it's fictional. Well, some of it is fictional. These are loosely-defined stories.

Uh, did the gagging and vomiting and crying and slapping and urination look fictional, though? That looked pretty real. Maybe they're referring to the plot lines that are pretty much non-existent as being fictional.

When Mr. Little repeatedly tells women to drink down his urine so they can vomit it back up, that seemed pretty real. And what they did seemed really real.

The insertion of a speculum in a number of those scenes. That's downright sadistic. Is that healthy?

Making a woman drink his urine out of her own anus through a tube, is that healthy? Is that degrading?

Making a woman lick vomit from his anus, or another woman's anus, is that healthy? Is that degrading?

Making a woman suck semen out of the anus of another woman?

You get the point, ladies and gentlemen.

(11:00 o'clock)

Even Mr. Little on that scene said, "That's nasty." That tells you something.

Where is the serious value in doing these things? Is there a value in literature, a serious one? Art? Politics? Science?

This is nothing but crass commercialization of the abuse of women, requiring women to gargle urine and semen and vomit in their mouth, at the same time? Are those acceptable depictions, or are they just patently offensive?

Where is the value?

Some of the scenes rolled toward the end, they shoot the Max Hardcore website name across them, and it says, "See what you've been missing."

You didn't get to watch any videos yesterday, ladies and gentlemen. Did you miss them?

Now, there are sections of some of these that have photos, trailers, advertisements for other; do they change the real dominant theme of this, or are they consistent with it?

Aren't they just ads for more videos?

Golden Guzzler 7. There was an intro and an AIDS public service announcement. Was this video put together for -- to educate people about AIDS safety?

The only value the video added was pointing out Mr. Little's own statement that you would see some pretty graphic sexual activity that some may find offensive.

The Chloe and Fawna scene. How many times did he slap the girl in that scene? Maybe you've seen that before on TV or in movies, but not in this context.

It was meant to demean, to degrade and to defile.

Would your average fellow citizen find that offensive? Where is the literary value in it? Where is the artistic value? Where is the political value? Where is the scientific value?

Planet Max 16, Summer in Catalina, tons of vomit in that scene. One girl vomiting into the mouth of another.

Summer testified here about her experience with Mr. Little. I mean, it's clear that a lot of time has passed since she was involved in this stuff, and it sounds like positive things have happened for her in life.

Uh, but you can't deny what you saw in that scene. Toward the end she looked like she's not even there anymore. Catalina is telling her to do things, or say things, and she's not responding at all. She looks catatonic.

The only value in any of this is to Mr. Little. And it's at your community's expense and everyone else's expense. It's a sexual value, he gets gratification from it; and it's a financial value, he gets rich off of it.

Where does it all lead? He's been pushing the limits for years to make money. If this material is okay in your community, he's going to continue pushing the limits.

MS. KINSLEY: Objection.

MR. SIRKIN: Objection.

May we approach?

THE COURT: I'll sustain.

You need to refrain from making that argument.

MR. McANDREW: At this point, ladies and gentlemen, I'll have a chance to come back, but we would ask you to find him guilty and his company guilty on all charges.

Thank you. (11:05 a.m.)

THE COURT: Okay. We're going take a brief recess at this time. We're going -- it's briefer than usual -- we're going to take about ten minutes, and we'll start again at 11:15.

THE BAILIFF: Rise for the jury.

(Jury out)

THE COURT: Okay. Let's take ten minutes. We'll try to start at 11:15.

MR. SIRKIN: Your Honor, at this point I would like to make a motion for mistrial on the basis of two statements --

THE COURT: Wait a minute.

MR. SIRKIN: -- that were made.

THE COURT: Please have a seat.

MR. SIRKIN: I believe that in the two areas that were approached and were stated were discussed prior to final argument, and they were discussed yesterday, and they've been argued perhaps throughout.

Number one, the reference of sending a message,

and that clearly was discussed at many hearings before this Court.

And the second was the detailed references to pedophilia and children, and we discussed that again yesterday. They were put in there to inflame the jury, to -- to inflame them in a way that is not according to law.

And -- and this experience, Mr. McAndrews knows better. And so, at this point we believe that we're entitled to a mistrial. It was induced by him, he knew he was going over the line, and we believe that it's uncurable.

MR. McANDREW: Your Honor, I'll respond to that.

I was not suggesting to the jury that they need to send a message to Mr. Little. I was suggesting that they need to consider whether they want this in their community.

This is what this man's done for 15 years. It doesn't end. And they are entitled to consider all of that. It's all in evidence, and they're entitled to consider his motivations in deciding whether he knew what he was doing, whether he intended to do this, and whether he was assuming the risk that he was stepping over the line.

Now, beyond that, on the child issue, this issue came up in the testimony of the witness. This is not something I'm referring to out of -- out of course. He talked about philias. He was asked about pedophilia.

They want to argue -- this has been a major issue

here -- that this stuff is targeted to some deviant group and there's not an unhealthy interest in that.

Well, the jury is allowed to consider that deviant groups are sometimes unlawful, and material targeted to them can be unlawful too. That's what's at issue here, whether this material is lawful.

THE COURT: All right.

Two issues. First of all, bringing up "pedophilia" or that sort of deviant behavior, Dr. Brannon did -- did talk about that. I didn't -- tell the jury yesterday in a cautionary instruction that the defendant wasn't charged in any way or manner with any type of child pornography.

So, you know, I will be happy to give a cautionary instruction again, but I don't think that's a basis for mistrial.

As far as the argument that he has -- he made on two occasions, meaning Mr. McAndrew, I wrote the first down, "If you stop Paul Little, you've stopped the distribution of the videos. If you stop Jaded, Mr. Little will find another distributor."

I don't think that quite rises to send a message to the community, or to the adult book store, or a video business, or other -- another person. I mean, we're talking about Mr. Little, and I think that's a little bit different.

With that said, he made a comment at that point, he made another comment later on that you have objected to; I don't think it rises to the discussion that we had, let's send -- he can't argue send a message to adult businesses, or send a message out to the community. It's stopping Paul Little and -- and essentially, uh, convicting Paul Little.

So, it's a little different, but I would ask in the future that you not make that argument in that manner.

MR. McANDREW: My apologies, Your Honor. I was not intending to indicate to the jury --

THE COURT: All right, the motion for mistrial is denied.

MR. SIRKIN: Okay. But just for the record I would like to indicate that the testimony of Dr. Brannon indicated in discussions of paraphilias, and he said that pedophilia may be a pedophile, and he left it at that.

The reference went on, after saying that reference of what the testimony was of Dr. Brannon, to then starting the issue as to children and portraying children. I believe the inference that was being given, the inference of children in -- involved in the -- you know, the theme of these particular movies, which we did have a discussion about yesterday, and the Court agreed with us that that was not appropriate --

THE COURT: And I did.

MR. SIRKIN: -- and so I believe that he went -- he went that step further.

THE COURT: All right. If there -- think about if there's a cautionary instruction -- I'm not going to grant a motion for mistrial -- is there a cautionary instruction that you want me to give the jury, think about what you would like it to be, and I will consider it.

MR. SIRKIN: And one other thing for the record, we adopt all the objections that we made yesterday in regard to the instructions that were given by the Court, so that the record shows that we re-adopted those.

THE COURT: Okay.

And I've so noted -- and so noted.

MR. DOUGLAS: And I believe the record is complete that as to comments, uh, on behalf Max Hardcore, Incorporated also are adopted by --

THE COURT: And -- and I generally conclude that any objections that are made by either Mr. Sirkin or Ms. Kinsley on behalf of Max World Entertainment, Inc., are also, uh, adopted by Paul Little. If that's not the case, then I expect you to tell me.

MR. DOUGLAS: Thank you.

THE COURT: All right.

Five minutes, until 11:15.

THE BAILIFF: All rise.

(11:10 a.m.) (Mid-morning recess)

(11:17 a.m.)

THE BAILIFF: All rise.

(Pause.)

This Honorable Court is again in session. Be seated, please.

THE COURT: Okay.

Ms. Kinsley, are you going to be using the document camera or the --

MS. KINSLEY: The -- the document camera.

THE COURT: Okay. Let me make sure I got it on here.

(Pause.)

Okay, bring the jury in -- oh, wait, I'm sorry, we're missing some people.

We need to get Mr. Little and Mr. Douglas in.

Mr. Benjamin, see if you can find the rest of your group.

MR. BENJAMIN: Sure, Judge.

I think Mr. Douglas went to find Mr. Little, but I'll --

MR. SIRKIN: Your Honor, in their absence I could propose that the Court re-read to the jury the paragraph on page 16, the second paragraph, that there's no claim in this

case that anyone violated the provisions regarding 2257, or that any actors depicted in the charged material are under age.

THE COURT: 16 of the standard --

MR. SIRKIN: Of the instructions the Court read this morning.

THE COURT: Okay.

MR. SIRKIN: Thank you.

(Pause) (11:19 a.m.)

THE COURT: Jurors all ready?

THE BAILIFF: Yes, ma'am.

(Pause.)

THE COURT: Do you think they're all out looking for Mr. Little?

MR. SIRKIN: He smokes, and I think that, you know, that's probably where he's at.

(Pause.) (11:20 a.m.)

THE DEFENDANT: I apologize, Your Honor.

THE COURT: Okay, listen to when I -- when I say that we're going to start again. You need to be present. And I could bring the jury in and we could all sit here and just wait for you. So, try to be on time.

Let's bring the jury in.

(Pause.)

THE BAILIFF: Rise for the jury.

(Jury in)

Be seated, please

THE COURT: Ladies and gentlemen, before we begin, let me just remind you, as I did when I read the jury instruction, that there is no claim in this case that there are any violations of 18, United States Code, Section 2257, or that any of the actors or actresses depicted in the charged material are under age.

All right. Ms. Kinsley, on behalf of Max World Entertainment.

MS. KINSLEY: Thank you, Your Honor.

Good morning, ladies and gentlemen of the jury.

On behalf of my co-counsel, Max World Entertainment, Inc., and Mr. Little, I want to thank you for your service in this case. It's been a long couple of weeks, and we appreciate your patience, your diligence, and the hard-working commitment that you've made to participate in this case.

When we started this case last Tuesday back, in the voir dire portion of the case where I asked you questions, I asked each and every one of you if you would make a commitment to watch the movies and the video clips charged in this case in their entirety. And each of you have followed through with that commitment. And again, we say thank you.

I also asked each and every one of you if you would make a commitment to hold the Government to its burden of proof in this case. And each of you responded that you would. And now is the portion of that case when we ask you to make good on that commitment, and we trust that you will do that.

Now, we have a lot of -- a lot to talk about here this morning, and I want to give you a little bit of a road map of how that's going to work.

First of all you're going to hear from me about some of the elements of the statutes of the -- the crimes that are at issue here, and in particular the knowledge element, and we're going to talk a lot about that.

And then in a minute you'll hear from my co-counsel, Mr. Sirkin, about the obscenity issue, whether or not the material in this case is actually obscene.

And so, I ask your patience in listening to both myself and Mr. Sirkin about each of these very important issues.

Today is indeed a very important day. It's an important day for you-all. For many of you this represents the first time that you've been able to go and deliberate and render a verdict in a criminal case.

It's an important day for the Court. It's an important day for the Government, I'm sure, whose, uh --

whose role in the system is not to secure a conviction, necessarily, but to see that justice is done.

It's an important day for me and for the attorneys here who care about Mr. Little, who care about the outcome in this case. It's an important day certainly for Mr. Little.

But there are some other people, someone else that today is important to, and that's Max World Entertainment, Inc.

Now, you might have asked yourself as you were sitting here during this case why is the company on trial? Who is this company? Why is there no one sitting over here with this group of attorneys?

Who is the company?

Well, let's talk a little bit about that. There's no doubt -- it's not disputed at all -- the Government has shown you that Mr. Little is certainly a part of Max World Entertainment, Inc. It's not hidden, it's not a secret. That certainly is the case.

He acted in the material, he produced it, and he put it into the commercial marketplace. No question about it. But who else is Max World Entertainment, Inc.?

Now, the Government has told you that it was just Mr. Little, and they've put up a lot of documents, you've seen the case, you've certainly seen that Mr. Little was

involved with the company.

Who else?

(Pause.)

Let's talk about Government's Exhibit Ten.

This is a document you've seen. It's a document that the Government showed to you. And they had a lot of highlighting on their copy, on the first page.

Maxhardcore, Max at maxhardcore.com, this Pleasant Ridge address. They didn't flip to page two. Let's do that now.

Take a look at this e-mail that's listed up here.

Richard at maxhardcore.com.

Who is Richard? Is he someone else involved with the company?

(Pause.)

Now, let's take a look at Exhibit 14C. This is the CCBill records, also a document the Government showed you. Again, we saw a lot of Mr. Little and Max World on this.

The Government didn't show you page two.

(Pause.)

Account contact name: Paul Little and Gordon Cox.

Who is Gordon Cox?

Is he part of the company?

Now, let's take a look at Government's Exhibit

28B.

Again, another document you've seen, familiar with.

Contact: Big Paul, Max, Marty.

And if you'll think back to the testimony of Mr. Komurek from Jaded, he told you that his main contact at the company was Big Paul. Here he is, Big Paul. Big Paul and Marty.

Who are they?

Are they in the company?

Your Honor, I'm going to be showing a lot of documents. Is it okay if I just stay here instead of going back and forth?

Thank you.

So, when we talk about Max World, we talk not only about Mr. Little, but about Richard, Gordon, Big Paul and Marty.

It's an important day for the company, too.

Now, a big issue in this case -- and it's one that you're going to hear about later -- is the question of obscenity; whether or not these materials are, in fact, obscene under the standards that the Judge has told you.

But the Government is required to prove more than that. The Government -- the Government is required to prove each and every element of the crimes charged in this case.

They are required to prove in order to -- for you to reach a verdict of guilty, that Max World Entertainment, Inc. knowingly used an interactive computer device to sell and distribute the video clips that are charged in Counts One through Five; and that they knowingly caused to be delivered by mail -- knowingly by mail -- the movies that are charged in Counts Six through Ten.

Now, the Government has spent a lot of time talking to you in its portion of the closing arguments today about things that prove nothing. Things that are not disputed.

There was a website, there were clips on the website, there were movies that were made, the movies were sold. None of this is at issue, and none of this is disputed. And none of it means that the defendants are guilty in this case.

Now, I told you there were additional elements that the Government must prove, and I would like to read those to you exactly as the Judge instructed you this morning.

Looking at page nine of the jury instructions, and this pertains to Counts One through Five, the internet clips. The Government must show the following elements beyond a reasonable doubt:

First, that the defendants knowingly used a

facility or means of interstate or foreign commerce, or an interactive computer service in or affecting interstate or foreign commerce to transport certain materials, as described in the Indictment as charged.

Second, that the defendant transported such materials for the purpose of selling or distributing them.

Third, that the defendants knew at the time of such transportation the general sexual nature of the content of the materials.

And fourth, that the materials were obscene, as defined in these instructions.

Each and every one of these four steps must be met beyond a reasonable doubt for you to find guilty.

Now, with respect to Counts One through Five, let's focus on the first part of that test, and, in specific, the word "knowingly."

Did Max World know that the server was located in Tampa? Is that important? Absolutely.

Why is it important? Because the Judge has told you that whether or not materials are obscene turns on your community standards here in the Middle District of Florida.

Was the material purposefully sent into this community? Absolutely not.

What do we know about this? Well, first of all, we know from Mr. Fottrell, the Government's computer man, he

came in and told you that he had 20 years of experience in computers; college degrees in computers. He had even won awards. I asked him that question, did he win awards. He had won awards for his work in computers. He has above-average and then some knowledge about computers.

Does Mr. Little or Max World share that knowledge?

Now, what did he tell us? He looked at these five clips from his office in Washington, D.C. Didn't look at them in Tampa. Looked at them up there. And then he ran this trace route.

(Pause)

Government's Exhibit Two, and you've seen this, and you're going to see it again. Government's made quite a lot of line 14. TPAX. Well, that must mean Tampa.

Do you recall when I asked Mr. Fottrell about this? He said, I think it's in Tampa. I know what the airport code is for Tampa, so it -- it's probably Tampa.

Did he really know that?

And then remember what he said about line 15. He said, this is the Max Hardcore website.

Where is it? It doesn't have any identifiers of a city, or any airport code on it. Where is it?

He didn't know. He had to run the trace route. And he specifically said that, recall that. He said, you would not know where your website was bouncing to, all over

these different cities, unless you ran this trace route.

Did Max World ever run a trace route? Did you hear any evidence of that? Absolutely not.

Absolutely not.

Now, we also heard some important information from the Candid Hosting company, Mr. Charmatz. Remember him? He came and showed you the pictures of his big computer room with all of his server equipment.

What did he tell you? He told you very specifically that he'd never met Mr. Little; that he had no information that Mr. Little had ever been to Tampa; had been to the server room in Tampa, or knew that the server was located in Tampa.

He told you that right from that witness chair.

Why is that important? Well, because -- let's go back to Mr. Fottrell's testimony, the White House website. Remember that example? He was talking about the White House website being housed in Dallas. And he knew that because he ran a trace route on the White House website.

Now, if you and I are going to go visit the White House, we go to Washington. If we're going to send a letter in the mail to the White House, we send it to 1600 Pennsylvania Avenue in Washington, D.C. We don't send it to Dallas.

How would we know that the White House website was

actually in Dallas?

Let's apply that here. How would Mr. Little or Max World know that their web site was actually in Tampa?

Now, the Government makes quite a lot of checks, checks being sent to Tampa.

Do we know that? I don't think we do.

Go back to Exhibit Ten. I think the Government told you -- Mr. McAndrew told you that this was a contract. No signatures, no language saying who's going to do what, who's agreeing to what.

Doesn't look like a contract to me.

More importantly, while there is some information that the bill was paid by check, there's no information of where that check was sent to. Take a look at this document. You'll have it back with you. It's pretty long. No Tampa address in here whatsoever.

But even if there was, even if checks were mailed to Tampa, what does that show?

Now, the Government says, well, Mr. Charmatz said that at the time he began doing business with Mr. Little and Max World there were only -- their only location was in Tampa.

When was that? When was that conversation?

Page two, right here at the very beginning of the document, March 3rd -- or March 7th, 2003. This is when

they started doing business.

When were these clips accessed? In January of 2006, three years later.

How does this translate to knowledge that a server is in Tampa? It doesn't. (11:35 a.m.)

Without that knowledge, ladies and gentlemen, as the Judge has instructed you, you cannot find the defendants guilty. You cannot find Max World guilty on Counts One through Five. You must find them not guilty because that knowledge does not exist.

Now, let's talk about Counts Six through Ten. And these also a have a knowledge requirement.

Take a look at the Judge's instructions to you, page 14. There are three steps here that you must determine in making your verdict on Counts Six through Ten. These steps represent the Government's burden. This is what the Government must prove.

First, that the defendants knowingly used or caused the mail to be used for the conveyance and delivery of certain material, as charged.

Second, that the defendants knew at the time of such mailing the general nature of the content of the material so mailed.

And third, that the material so mailed was obscene, as defined in these instructions

Take a look at that first section. Again, the word "knowingly" appears. Knowingly used or caused the mail to be used. Now, is it knowingly used or caused?

No. It's knowingly used or knowingly caused. And how do we know that?

I'm going to ask you to flip back a page, page 13. This is the law, the actual law itself. And it says: Whoever knowingly uses the mails for the mailing, carriage in the mails, or delivery of anything declared by this section to be non-mailable, or -- and here's the important part -- knowingly causes to be delivered by mail according to the direction thereon, or at the place at which it is directed to be delivered, and it continues.

So, that knowingly requirement applies not only to the word "used," but to the word "caused," as well.

Now, let's talk about what Max World knew about the mail. And I think when we look at the evidence we're going to find that Max World knew nothing.

Now, there's a couple of preliminary issues we need to talk about with this. The word "mail" or "mails" is used quite a lot in the instructions. And if you'll recall back to the first day of trial, another question I asked you all was how many different ways can you ship something? And we heard answers like DHL, FedEx, uh, UPS, or regular mail.

Regular mail is something separate from private

55

mail or common carriers. Totally distinct. It's the Government's burden to show you that the regular mail, the United States Postal Service was used in this case.

And we know this because -- remember Linda Walker, the agent who came and actually bought the videos and had them delivered to Tampa? She was a United States postal inspector connected to the U.S. Mail.

(Pause.)

Now, a very important fact in this case -- and I think it's not disputed, I think you heard it from the Government -- is that these movies were not shipped to Tampa by Mr. Little or by Max World. They were shipped to Tampa by Jaded Video, JKG, Inc.

We all know that to be the case.

Remember the Camtasia capture when Agent Walker was walking through how she purchased the videos? Very clearly there was a transition from the Max Hardcore website to the Jaded Video website. Change in look, change in logo, change in the way that the picture was viewed.

She knew -- she told you this -- she knew that she was going to a different company's website. And the documents that you've seen in this case and that you will have in the jury room with you prove this.

Let's take a look at those.

(Pause.)

Exhibit 18. Order confirmation. Jaded Video. JKG, Inc., JKG, Inc. Nowhere on this document do you see Max World Entertainment, Inc., or Mr. Little's name

Exhibit 20. Another order confirmation. Jaded Video, JKG, Inc., JKG, Inc. And here we have an address -- and this is significant, too. It's on Barranca Parkway in Irvine, California. This isn't that Pleasant Ridge address that you've heard so much about from the Government that they think to be so significant.

This is in a whole separate city on a whole different street, because it's a whole different company

Exhibit 22, last order confirmation, we have the same thing, jadedvideo.com, JKG, Inc., JKG Inc. All of these sales were made by Jaded Video

The money was sent to Jaded Video.

Exhibit 19, you see the money order again with the Irvine address on Barranca Parkway. Not that Pleasant Ridge address, that's not where this went to.

Exhibit 21, same thing. JKG, Inc., clear as day.

And Exhibit 23, the last money order. JKG, Inc. Right there, right in the documents that the Government showed you.

What else do we know? We know that when the packages arrived -- here they are -- they came from JKG, Inc. And inside each package is a receipt from Jaded.

Absolutely no doubt about it, these sales were made by Jaded.

(Pause)

Now, the Government has told you that it's enough if use of the mail might be foreseeable. Was use of the mail foreseeable in this case? Did Max World know or have any reason to know that Jaded was going to choose the U.S. Mail instead of DHL, FedEx, UPS, one of those other carriers?

That's what the Government has to show you, and don't lose sight of it. They have to show you that Max World knew that the mail would be used by Jaded.

Now, what do we know about this? Well, we know from Mr. Benjamin asking questions of Mr. Charmatz that Jaded never had a conversation with Mr. Little or anybody else from Max World about the mail. They never said, hey, guess what, Max World, we're going to be using the U.S. Mail today.

Didn't happen

They also said -- Mr. Charmatz said that Jaded had complete control of the material once it came into their possession. He chose how to send it out.

I'm sorry, it's Mr. Komurek from Jaded. You know the man I'm talking about, the one from Jaded.

Now, the Government might say to you that it's

implicit or understood somehow that because these two companies had a business relationship that the mail was going to be used.

In fact, the long-standing business relationship shows you that the mail was not going to be used, and that Jaded preferred and asked and requested to use another carrier.

Let's take a look at the evidence on this, Exhibit 28B. Again, a document the Government showed you. They didn't highlight this. They didn't highlight for you that on the purchase order coming from Jaded the shipping method is listed as UPS Ground.

Here's another one. It's part of the same exhibit, again purchase order from Jaded, UPS Ground.

Jaded asked Max World to send the movies using a private carrier. That was their business history. If anything, the only thing Mr. Little or Max World could have thought is that UPS Ground would be used to ship material.

Now, there's something else we need to talk about with respect to Mr. Komurek and Jaded, and that's this immunity situation.

The Government knew on March 27th of 2007 and March 23rd of 2007, when these movies we're purchased, that they were purchased from Jaded. Agent Walker told you that, they knew it all along. Wasn't a surprise, wasn't hidden,

wasn't secret.

Movies bought from Jaded.

And yet Agent Walker told you that she did nothing to investigate Jaded. All these records, all these witnesses, all these documents we've seen on Max World, they didn't do that for Jaded. None of it.

We also know that they did not charge Jaded with a crime, and that they will not use Mr. Komurek's testimony against him to charge a crime

They have allowed Jaded, by giving him this immunity, to continue to sell to the Middle District of Florida and other places, 99 percent of the adult entertainment market.

Is that a bad thing? No.

What does it show you, ladies and gentlemen? It shows you that the Government knows that sending these materials to the Middle District of Florida is not a crime, because Jaded is still doing it to this very day.

Now, Mr. McAndrew told you something to the effect of, if you stop Paul Little, you stop Maxhardcore. But if you stop Jaded, you don't stop Maxhardcore. Said that to you a few minutes ago.

Well, ladies and gentlemen, if you stop Jaded, you stop 99 percent of adult entertainment. Mr. Komurek told you that. He told you that he does business with everybody.

Clearly, the Government knows that it's not illegal to purchase, view, consume and have these materials in the Middle District of Florida

Here's another thing to ask yourselves: Is this a fair situation? Here we have Jaded, the company that actually sold the stuff, actually chose the mail, actually made the transactions, no repercussions.

And yet we have Max World and Mr. Little on trial here today for something that someone else essentially did.

Let's talk a little bit of an example. If an individual who buys a gun from Dick's Sporting Goods, or Wal-Mart, or a pawn shop, or something of that nature, and they go out and they use the gun for something that they shouldn't have done. They use the gun to commit a crime. Do we hold the retailer liable? No, we don't. And the same should apply here.

Now, ladies and gentlemen, you may not have liked these movies and these internet clips, you may not have enjoyed watching them, you may have found them, as I did, to become boring after having to watch them for so long --

THE COURT: Okay, let me -- your opinion about them is not relevant. So --

MS. KINSLEY: Well, you may have had a number of differing reactions, and I've listed those for you. But despite your reaction or your personal feeling about the

material, it is still the Government's burden to prove each and every element of the offense, including knowledge, with respect to all of the counts, and they have haven't done that.

If you -- if you go back to the jury room and you only talk about two things, there are two answers that I want you to remember and discuss. The first is when Mr. Charmatz from Candid Hosting was on the witness stand, and he was asked if there was any evidence that Mr. Little or Max World knew that the server was located in Tampa, had ever been to Tampa, or had any reason to believe the website would be in Tampa; and what he tell you? No.

And the second thing I want you to remember and consider and talk about, is when Mr. Komurek sat on the witness stand, and he was asked if he had any evidence or reason to believe that Mr. Little or Max World knew that he was going to choose the U.S. Mail to send the material to Tampa; and what he did tell you? He told you no.

Turn the Government's nos, the nos of the Government's witnesses, into your no. Tell the Government no; no, they didn't prove their case. And for that reason you should find Max World not guilty.

THE COURT: Mr. Sirkin. (11:50 a.m.)

MR. SIRKIN: Thank you, Your Honor.

(Pause.)

May it please the Court.

Ladies and gentlemen.

Counsel, and ladies and gentlemen of the jury.

I'm not going to try to be repetitive of any of the remarks that were made by my co-counsel, Ms. Kinsley. I think it's important to remember that this is not a case that you determine on the basis of what you believe, or what you think.

You are to be, uh, you know, kind of an interpreter; you are to take a synthesis of the most sensitive and the most liberal person in this particular community.

And I know that you all spent a couple of very uncomfortable days, and I'll venture to say that each and every one of you, when you received your summons to appear for jury duty, never expected to be put in a situation that you were, in watching particular material that you had absolutely no choice in watching; that you probably maybe in your daily life would never watch. But again, it's a protected and very important task that you have to undertake.

And it's awesome in the sense because we so much, as the Court had instructed you -- and I'm going to repeat it because I think it's so important to keep in mind -- the freedom of expression is a fund -- is fundamental to our

system and has contributed much to the development and well-being of our free society.

And the exercise of the Constitutional right of free expression that all of us enjoy, sex may be portrayed and the subject of sex may be discussed freely and publicly. Material is not to be condemned merely because it contains passages or sequences that are descriptive of sexual activity. However, the Constitutional right to free expression does not extend to that which is determined to be obscene.

And then the Court went on further: Because the essential necessary element of free expression is so important to us that we have developed and evolved law that is known as the Miller Test. Because it's simple, if the acts that you saw portrayed in this courtroom over a couple-day period that the Government didn't want you to see all of it, we had to publish it.

And we published it on cross-examination because you must determine, as the law demands, that the material, at least the two parts of the test, must be viewed as a whole.

We didn't want to censor you, we didn't choose what you came into this courtroom and that the United States picked out for you to view. But why it is so important and why it is so protected is, is that the Supreme Court has

developed and evolved a test.

If it just depicts the acts that were described to you by Mr. McAndrew, hey, it had those acts. Those acts as they were depicted in the screen were probably to all of you distasteful.

But being distasteful doesn't make something obscene. There's a part to it -- two other parts to it. One is you must apply contemporary community standards, and would the average person, the community as a whole, find that the material appeals to prurient interest, which is defined as a morbid and shameful interest in sex.

The second part is the patently offensive depictions of the particular sexual conduct. And again, you are required to apply contemporary community standards.

And I venture to say that each and every one of you probably don't spend a very large portion of your day on a daily basis talking to your neighbors, your friends, your acquaintances, and those that you come in contact with in your daily work environment, about their ideas and thoughts and fantasies as it relates to human sexuality.

So, you know, again, it is something that is out there, it is important to apply, but yet it is not something that you constantly consider and think about or discuss and get ideas over.

There's also a third part, that's extremely

important, is whether a reasonable person would find that the material taken as a whole would find that it lacks serious artistic, literary, political and scientific value.

Now, what's interesting is, is that the Court's never really gone on and defined that -- those particular terms. We know what scientific value may be when -- in some sense we may know what literary artistic when we go to theater.

But we also must consider in artistic and that -- and that somewhat of what we consider to be entertainment, and what we may learn and we may find value from, that when we go out into the world and we look and think about our fantasies.

But I'm going to concentrate at the moment on this area of contemporary community standards because it's so essen -- essential.

That number one, you all have heard the instruction, that the burden of proof in this case in upon the United States Government, who brought it, to prove to you each and every essential element of the charges that they have brought beyond a reasonable doubt.

And part of that essential element in this case is, as it relates to all ten counts, is they must prove to you by evidence that this material is obscene, and it appeals to a -- number one, to a prurient or morbid and

shameful interest in sex of the average person.

Now, ladies and gentlemen, did they present any evidence at all to you in regard to, number one, who the average person is? They say it's you. They throw it in your lap.

And they say, you know. Well, do you talk to people about it? Do you go out in the community and find out what's out there? Did you do that before you came here?

No. You probably didn't. It's your every-day life.

In addition to that, the burden is completely upon the Government. They showed you nothing. They want to shock you. They put it on. And because they believe, and you may think it's distasteful, and you may get uncomfortable viewing it, remember that the instructions, if you go back and read it, is, one, you have to concentrate on who is the intended recipient.

Generally, the intended recipient is a person who decides to go out into the community, or to go on to the internet, the worldwide informational highway, and take a look and find out what's available to be brought into their community for them to view.

They're the recipient of it, they're the target, they're the person that wants it.

We at least brought in and attempted to give you

some educational value of that, because we think it's an awesome task that you have to undertake.

We brought in Dr. Barrett -- all right, uh -- all right, Brannon -- excuse me -- Dr. Brannon, who came in and testified and gave you your thoughts -- his thoughts as who -- as a professional, as a clinical psychologist who teaches -- who did teach human sexuality, that who would be the likely recipient of this material. And he said to you that he believed that it was a specific group.

He also told you on redirect examination that that particular group who would seek this material out would find that it is not morbid, shameful or unhealthy for them to view this particular material.

We also tried to educate you a little bit about what is this community, what makes it up. And yes, we have to prove to you that material isn't simply available in the community, but that it's accepted.

But you are allowed to draw inferences from evidence that's presented to you, and use your common sense in relation to those -- those inferences that you can draw.

We brought in -- we brought in testimony from two residents of the Middle District of Florida who are private investigators who went around.

Ms. Rush told you that there are at least 54 adult businesses in this community, in the Middle District. Mr.

Scott also told you -- I think he said approximately five dozen adult retail businesses.

You heard Ms. Rush tell you that in some of the stores they had as many as 10,000 DVDs. Now, she's not going to go look at every single one of them -- and they also showed -- and they showed you a live Google search -- of where you could take as a starting point in the pri -- wherever you may be in a private environment, no different than Postal Inspector Walker did in her private office.

And how did they -- what did they know about community standards? What did they help educate you about in regard to those community standards?

Nothing. They brought in a forensic expert whose qualifications are -- they're -- they're beyond. They're untouchable. But what did he do?

He sat in his office in Washington, D.C., which is I don't know how many miles from here. I know it's further away than places in the midwest. It's at least a thousand -- perhaps close to a thousand miles away from here.

And he went searching on the internet, and he came up and out of all the sites that are out there, and you saw, I mean, millions of them, there are more sites that are on the internet than there are of your star football player, Tim Tebow, who was the Heisman trophy winner this year as a

sophomore; that there are more hits -- or there are more available spaces out there that you can go online and you can look for particular material.

Even heard that there are more of that than there are of the coach of the Tampa Bay Buccaneers.

You also heard from Ms. Rush that adult businesses are located right across the street from Yankee Stadium, their practice stadium, the Steinbrenner complex, that brings in just literally into this community every spring I don't know how many hundreds of thousands of people who will go to that stadium, and you can't miss, you know, the adult businesses appear to be located there.

You can draw an inference. There was material bought, you heard the descriptions of the material that was bought. It's -- you know, it may not be exactly the same, it might not have had Mr. Little in the particular movies, but it's there and it's available. And you can infer from that, that this community does, in fact, say, okay, people want to have this, that's their choice.

They can go out and pick it, and that this material does not -- because there's no evidence to you that this material was designed to be an appeal to a morbid, shameful or unhealthy interest in human sexuality.

And if I watch a movie like that, and it does something sexual or response to me, that's normal. There's

70

nothing wrong with participating consensually in human sex -- sexuality. You heard that from -- from Dr. Brannon.

But the Government presented absolutely nothing to you. We attempted to give you some education in relation to that.

It also becomes significant to think about that community standard element when thinking about the patently offensive. The descriptions. Look, they show sexual conduct, they show human bodily functions. There's nothing necessarily -- you know, you may not like the way it was presented, or whatever, but again, you have to apply the contemporary community standards.

We've evolved a long way. Since those early comments of Mr. Little in 1990, the world has evolved. In 1990 the internet was just a little thing. There were very few people along with that.

I think that we all were then under the understanding that it was just beginning by -- by then Vice-President Gore. I believe that, you know, the internet was -- that was what he was working on before he went to the White House -- or when he was Vice-President.

But again, it was such an -- in its infant stage. And all of a sudden this world has expanded. Everybody's got personal computers. We all go searching, we go surfing. This stuff is out there. It's there for you to make a

choice.

And when we get to the idea of talking about making a choice, that's political. And that's how we live in a society, and that's what we recognize, and that's what we as free people, you heard, it's fundamental.

May not like it, but after all, let's be realistic and honest, if -- if everything was only what was pretty and what was acceptable, you know, generally to, you know, a hundred percent if we had voting on what should be allowed in free speech and forget those few people that are the minority, or whatever their number may be, of what they want to be able to be entertained by and look at, we wouldn't need the First Amendment. We wouldn't need to give that protection. We think it's so important in our society that people are allowed to make their own decisions.

You decide what you want to view, what you don't want to view in the private environment as long as it's consensual. What's so significant, and to show really and truthfully the extent of the political involvement in this particular case, was really the demonstration that the Government wanted. They showed you one entire video.

But then thereafter they showed you snippets of four videos. They chose for you what they wanted you to see saying, well, we'll publish it and maybe they'll watch it when they go back to deliberate; when, in fact, the law

requires that you view it as a whole.

Not only did they decide what material to bring in here, they decided what portion of that particular material you should be able allowed to view in a public environment.

They brought the charges, they picked the videos, they picked the number. You heard -- I believe it was, you know -- you know, I guess it's Inspector or Agent Fottrell tell you that there were over 950 available items on that Maxhardcore Entertainment website.

And he picked out five. He viewed -- you know, he looked at the previews and, you know, the Government's going to tell you that it wasn't -- it wasn't designed for any particular recipient.

Certainly it was. I mean, it showed itself. Each of the previews showed you what activity was in -- within those particular videos.

And so, that if you were not a recipient or someone interested in that, you'd never order it. You have that choice. You can click that computer off. You can change. You can go re-Google some other subject matter, if that's what you choose to do.

But again, they decided what's coming into your community, and then what -- you know, when you look at it and think again about it, okay, here he did this in Washington, D.C. in January of 2006. And nothing happened,

nobody came to try to stop this from being distributed in any other community anywhere else.

It was easy to find out. They went on the website, and you could see it directed you right away to Jaded Video out in California. Go out there and talk to them, do something with them.

No, they wait 14 or 15 months, this stuff continues to be circulated, it's out there, it's coming to Tampa.

Look at the records. Look at the billing records. People are buying this. Look at -- you heard the testimony of the gentleman from -- you know, from the internet web co-hosting thing. They went -- they had at least 500,000 customers.

And not only did they have 500,000 customers, they now have 14 locations. They have three in the United States, and 11 worldwide. There are people that view this.

And you're not isolated, you know -- part of the whole. You are part. The Middle District of Florida is part of that whole. And you all have that right to make that particular choice, and you're no different than anybody else.

But they -- whatever happened -- and nobody explained why there was this 14- or 15-month delay. It was

very easy. You saw Mr. Scott do the Google search right in front of you, and that was live. That wasn't on a disk, that wasn't downloaded. That was right here in this courtroom connecting on a wireless connection to the -- to the web.

And it was available, and they did it, and nothing happened. And all of a sudden they choose because they say they traced the server here. And what does a server do? It's one of those routes that come along and whatever.

Certainly the gentleman who runs the server doesn't believe there's anything wrong with it because he's got 500,000 customers. And don't say, you know, well, we can't tell you how many of those customers came from the Middle District of Florida because it wasn't broken down.

Well, he told you he can locate throughout the world where places, you know, this stuff travels. Could he not tell you how many customers there were, or how many hits come on that server from this Dis -- Middle District of Florida?

Maybe he did, and maybe he found that, you know, this was a community that, you know, they wanted to pick out and they decided, because they were going to tell you in this community what you can and cannot watch.

They didn't give you any evidence of that. They absolutely gave you nothing. And as I say, we tried to

educate you somewhat with that.

Now, let's think a little bit about it. You know, what is a morbid and shameful and unhealthy interest in sex? Did anybody tell you that? We heard a little bit from Dr. Brannon, but it had nothing to do in particular about this particular material. There's nothing wrong as long as it's consensual adult behavior.

And you heard, and all of a sudden, you know, Ms. Nicoletti, you know, she's older or whatever else, look at the way she looked at the end of that particular movie. She had absolutely no difficulty walking into this courtroom and telling you and facing you and saying, I'm in that movie. I was in two of the scenes of the movies that you saw in this courtroom. I made at least 15 scenes with Mr. Little and Max Entertainment -- World Entertainment, Inc. I did it freely, I did it -- I did it of my own free will. We were acting. We were performers. I was treated well. Sanitary precautions were taken. I went back and did it again. I traveled internationally. And I made the movies.

It wasn't overwhelming pay, but she was a young aspiring actress at that particular time. She's not ashamed, she doesn't feel that she was degraded. You're only degraded if it's unconsensual and somebody makes you do it.

They're play-acting. We all go to movies, there's scenes in movies that we find distasteful, that are degrading and that they're shooting. We've viewed movies of the holocaust. And, you know, that's awful. There's nothing more degrading than any of that.

But we don't prohibit the dissemination and the right of free people in a free society and a free community to be able to make the choice to go see that. We learn from those things. We learn lessons.

If you learned from this particular material that, hey, I'm never going to watch that, and -- and I'm going to go out and I may get in -- politically involved and do something that way with it, that's fine. That's educational, and that has some political value to it.

But taking it and saying you're not allowed to make that choice. Hey, folks, this is the United States of America, it's the home of the free and the land of the brave, and we are allowed to make those kinds of choices. It's us. This is America.

We're not Red China, we're not some of those countries of the world that say, you will not and we'll filter out the internet from you, and we will not let you make those kinds of choices.

It's important. And it's important to make available those things that other people find distasteful.

I've got that right, you've got that right, as long as it's not forced upon you. And there's not one bit of evidence that came before you that said, hey, you've got to watch this. Except for the 13 of you. You were brought in here and you were forced and, you know, you had as part of your duty to do that.

And I beg of you again, it's an essential part of all ten counts of this Indictment that you must find that this material is obscene, and the Government had the burden to prove that to you.

And don't let it -- don't get overshadowed by this idea that it was shocking to you, it was distasteful to you.

Taken as a whole, you might have -- you can -- we can infer because it was repetitive. Again, it was repetitive because of the number of videos that they brought forward for you to view. And they decided that. It was really about eight, eight-and-a-half hours of material. And that you were exposed to.

They wanted to censor you from that. And -- when you looked at it all, and you think about it, it got to be -- you probably considered it to be pretty boring and repetitive.

And it may -- again, I concede that it was distasteful. I wouldn't -- you know, to me it was distasteful. To some of you it might not have been. But

that's a choice we have the right to make.

And I urge when you go back, try to think about how much knowledge you have of this particular community. And again, not from -- you know, because you don't. And say to the Government, you showed me nothing. You showed me -- you gave me absolutely no standard to make a judgment on this, and since you did not, you have failed in that burden of proof that you undertook and the Government and the law requires that they do.

And I urge you that on all ten counts of the Indictment as to Max World Entertainment that, number one, you find that the material is obscene -- not obscene; and secondly, upon making that finding, the second decision will be very, very easy, is not guilty.

Thank you. (12:10 p.m.)

THE COURT: Mr. Douglas on behalf of Mr. Little.

MR. DOUGLAS: Thank you.

(Pause.)

Thank you very much.

My colleagues, the Government attorneys, thank you for the work you've undertaken. The work that you do is essential to the functioning of democracy. I understand the sacrifices you are making. I'm very grateful to you, and Mr. Little is grateful to you, as well.

THE DEFENDANT: (Nodding affirmatively)

MR. DOUGLAS: I'm going to go backwards. I'm going to start at the end.

All of know you how my presentation is going to end to you. I'm going to say to you, you will, you should find Paul Little not guilty. I'm going to start with that.

Why? Almost everything about this prosecution is backwards. Similarly, I'm going to start with the last five counts, Count Six through Ten.

The Government has provided you no evidence, not beyond a reasonable doubt, but no evidence of the community standard. Community standard is two-thirds of the Miller definition of obscenity.

As you have already had highlighted, the defense provided you with circumstantial evidence of the community standard. The Google sex acts, uh -- search, the -- the -- you compare the -- the sex acts featured in those movies to the biggest, you know, cultural icons we could think of.

David Cook of American Idol didn't generate as many web pages as -- as the sex acts that were depicted here. Only the Rolling Stones exceeded that, and only by a small amount.

That is circumstantial evidence of the community as -- as Mr. Sirkin indicated. There's no evidence that the Government has put in front you, and there's no evidence logically that there's anything about the Middle District of

Florida that is more sexually conservative than the rest of the country.

Over 50 adult DVD retail outlets. There's a reason that in their opening and in their closing the Government said, we're not against adult clubs. That's because they understand they're in the Middle District of Florida.

But there's more. In the jury instructions you are told that prurience is part of and connected to the target audience. Not just connected to the community -- which it certainly is -- but it's also interwoven with as an essential part of the target audience.

You were told by Mr. McAndrew that we would try -- defense counsel would try to confuse you. This is what he was talking about. I'm going to say to you that when you look at the jury instruction, and you combine that with the testimony of Dr. Brannon, it's very logical.

If the movie was not intended for your part of the community, then you can't adjudge whether or not it appeals to the prurient interest, the morbid and unhealthy, degrading interest of a community about which you know nothing.

If you'd make the determination beyond a reasonable doubt that that is what the target audience was, the Government has the burden to show you, to prove to you

that that material would be morbid, degrading, unhealthy for that community.

What's the only evidence you have on that? That of Dr. Brannon, who told you it was not, without contradiction.

(Pause.)

The Government has, or will, and probably both, told you that there was nothing on the website that limited the target audience. It was available to the entire world to see. That's exactly right. It was available to the entire world to see.

But nobody who reviewed the previews -- for an example, of those previews, of the five downloads charged in One through Five, if you look at the previews, it tells you who the target audience is.

If after seeing the previews you didn't want to see the movie, there's a very logical conclusion. You wouldn't buy it. It wouldn't be shipped to you.

And if by some mistake you bought the movie because you thought it was something else, and that movie was delivered to you without looking at the previews, each and every one of you anywhere, and everyone in this community, other than when you were sitting in this jury room charged with this obligation, has an off switch.

If you started to watch it, and you didn't like

it, you turn it off and you walk away.

That is essential to -- to this country philosophically, as Mr. Sirkin highlighted. It's essential to -- to the commercial nature to -- to the fact that this is a country where you buy what you want, you consume what you want.

That's the essence of American freedom.

No one who reviewed that website, who saw those previews, could possibly get the movie by mistake. And if by some bizarre circumstance that happened, they can turn it off.

Only you couldn't.

The government went -- Mr. McAndrew in closing went to extraordinary detail walking you through all the little bits of pieces of paper. That was the evidence, he kept telling you. Except when it came to the movies themselves.

Then all of a sudden he's not interested in evidence. He's telling you, react viscerally. I don't need to. You all were repelled by this. And he's telling you that's enough.

That can't be enough, because that's not evidence. The Government has offered you no evidence. They don't want you to -- to think about evidence. They just want you to react emotionally.

Logic is an essential part of your duty. In every criminal case that I've done, I have always heard the prosecutor say, when you become a juror, you don't leave common sense outside.

It was very striking to me that the only person that told you to rely -- rely and stick to your common sense was Mr. Sirkin. That distinguishes itself right there from every prosecution that I've of experienced.

But let's assume that you do what the Government wants you to do, and block out, completely reject everything that Dr. Brannon says. What are you left with?

The key trigger to the first and second prongs of the obscenity test is that it inspires a sexual response. That sexual response is the first step before you determine if it is a shameful, morbid, unhealthy, prurient interest in sex. If it doesn't inspire a sexual response, you don't go to prurience.

If your response was this was gross, it was gross-out material, as I would have called it in high school or college, then you don't have to think about deviant groups, you don't have to think about target audience, because it hasn't reached the first step of being sexualized material.

If it was gross-out material for you and not sexual material for you, you must acquit.

(Pause.)

Now, community standards. As I've said, as Mr. Sirkin said, there's been no evidence offered by the Government about community standards.

When you walked in the door here, when you became a juror, safe to say that if you had been asked, is there a defined knowable community standard? Do I know -- not what the community standard is; do I know that there is a community standard?

If you, when you became a juror, did not know and did not believe that there was a knowable, defined community standard, the Government has failed in its proof. And I am quite confident that you did not know, did not believe, and still don't know or believe that there is a knowable community standard. That's part of the burden of the Government, they failed that, you must acquit.

I promised myself I would say "you must acquit." There's a very bad association with that. You must find not guilty.

Talked about the first two prongs. Let's talk about the third prong. Mr. Sirkin alluded to the -- the serious literary, artistic, political and scientific value. I too want to focus on political value.

The offensiveness that Mr. McAndrew focused on, the offensiveness that none of you could have missed, an

essential component to each one of these five DVDs charged in Six through Ten, is the politically incorrect depiction and relationship with women.

That's what it's -- that's what defines the offensiveness. That's what Mr. McAndrew listed in his own mind when he told you what he saw.

That is the actual evidence of serious political value. It -- it is clear that the character of Max Hardcore -- you know, we'll be getting into the distinction between Max Hardcore, a fictional character, and Mr. Little, a distinction that has escaped the Government, I'll get into that in a moment.

But that character asserts the extraordinarily appropriately unpopular political view that women are whores, or other similar lower status persons, and that they should be dominated by Max Hardcore.

Now, this is play acting. This is not reality. It shouldn't be that difficult to determine, but listening to closing, I -- I was kind of surprised.

Uh, you may recall -- I hope you do -- there was once a show, All in the Family. There was a character, Archie Bunker. Archie Bunker was the epitome of the living bigot. Bigoted against everything. He was played by an actor named Carrol O'Connor. Carrol O'Connor was not Archie Bunker. Carrol O'Connor was not a bigot, far from

it, he was an ACLU type.

The entertainment -- and All in the Family was a broad comedy, laugh track, everything. The entertainment value, the entertainment of depicting a bigot had, without question, political value. That was the whole focus of it. If -- some of you are probably too young to have ever seen, uh, All in the Family.

Homer Simpson is the same thing. The -- the guy who creates Homer Simpson on the Simpsons, with the unpronounceable last name, Matt Romig, or Gernig, there is no chance that he is advocating that's the way you raise children, or that it's appropriate to fall asleep when running a nuclear power plant.

These are characters, fictional characters created for the purpose of entertainment. There's a difference.

What was particularly stunning, uh, earlier today in the Government's closing, the inability of the Government to distinguish between a character and a real person.

Throughout that portion of the closing where he said, is this functional? Is this fictional? Is this fictional? Making these women do these things is not fictional. And referred to all of the things: Urination, vomiting, uh, the physical, uh, uh, positions, the speculums, all that kind of stuff.

Is that fictional? Is that fictional? That's not

fictional. Making them do it is what's fictional, and appearing to make them do it is what's so offensive.

But they weren't made to do anything. That's the essence of the fiction. You know that because Melissa Nicolleti, not Summer, told you that.

Mr. McAndrew characterized a real live human being witness by the character's name. It's like sticking Carrol O'Connor on the stand and saying, Mr. Bunker, you really do hate all the groups he hates.

There's a difference. One's fiction and one's not. Before Ms. Nicoletti testified, you knew that Max Hardcore was a fictional character. You can't get anymore two-dimensional than that.

The entire character of Max Hardcore exists, functions, lives for performing three or four different sex acts on women. That's all there is. That's not a human being. That's -- that's barely a cartoon of a human being. That's the essence of fiction.

And again, the offensiveness highlighted has political value. That is the tension that arises.

Now, I've been doing this long enough to know, without even looking over there, the outrage that the Government is experiencing that I am characterizing this as serious political value. I anticipate that they will stand up and say that I'm insulting your intelligence, that I have

unbelievable gall to suggest that this has serious political value.

What serious political value? CNN is serious political value. 60 Minutes is serious political value. That's wrong. It doesn't have to be that to be serious value.

Low brow entertainment has serious value.

(Pause.)

I noted that in the Government closing they appeared, quite startling to me, to be unable to distinguish between fantasy and reality, and unable to distinguish between Paul Little, a real live human being that functions in the world, and the -- well, I said two-dimensional, let's be more realistic -- one-dimensional character of Max Hardcore.

Mr. McAndrew even pointed to the screen and directed you to follow a fictional biography of a fictional character and directed you to believe it as if it were the truth.

That's -- that's -- that is really an astonishing moment. And again, along with calling a real live witness, Ms. Nicoletti, Summer Love, a fundamental misunderstanding on that side of the courtroom that is part of the only reason that we are here.

Now, let's assume that you reject everything that

89

I've said so far, that you reject everything that -- that Mr. Sirkin has said so far, reject everything that the defense has said about obscenity, community standards, political value, all of that.

What then? I'm assuming for the sake of argument that you make that determination that all of the DVDs are obscene. What's your obligation? What's the end result then? It's still not guilty.

Why? Because an absolutely essential component is mail to Middle District of Florida. Paul Little did not mail to the Middle District of Florida. Neither mail nor Middle District.

What the Government has done, it has prosecuted the wrong guy. And you know who the right guy is because in a very straightforward stand-up way he sat in front of you and told you he was doing it.

He's the one.

Now, without question, obscenity is different than any other crime. There's no definition of obscenity that's clear. You know, if you -- if you're charged with selling heroin, it -- it -- the elements are clear.

This is the only crime that the elements of the crime are defined mostly by the people sitting in the box. So, I grant you, that is unique.

And for reasons that I don't understand, the

Supreme Court says that's okay. But nevertheless, how is this case created compared to every other crime? Is this a case where the Government discovers the existence of a crime, investigates the crime, figures out who committed the crime, and then prosecutes?

No, absolutely not.

Unlike, you know, dope deals, uh, homicides, that's the way things go. That's -- you know, Sherlock Holmes. That's -- that's TV detectives, and that's also real life.

A crime is discovered, the crime is pursued, the guilty parties are identified, evidence supporting the guilt of those parties is acquired, and it's presented in court. We don't have that here.

The testimony was -- the Government's testimony was, Agent Fottrell, expert in the District of Colombia, chose, on his own, five downloads in January of '06, or -- it's probably the right month, but anyway, in '06.

Those downloads were subsequently, 14 months later, ordered by Agent Walker to be shipped here, to be mailed here.

Agent Fottrell has never lived in the Middle District of Florida, has no information about the Middle District of Florida. That is a reflection of the Government not caring about the essential element of this claimed

crime, which are the community standards of the Middle District of Florida.

Don't know, don't care.

When the information came to them that they were purchasing and having mailed to the Middle District of Florida to the Government agent -- not from Paul Little, not from Max Hardcore -- but from Jaded Video, a/k/a JKG, Inc., run by James Komurek, Agent Walker told you that she conducted no investigation whatsoever.

Why is that? They don't care.

(Pause.)

Why don't they care? Mr. McAndrew told you. They want to stop Paul Little. That was not the decision, not the choice of Mr. McAndrew. It was not the choice, it was not decision of Agent -- of -- of Fottrell.

Supervisors of those individuals, people unknown to us, in the United States Government, in the District of Colombia --

MR. McANDREW: Your Honor, I think this goes to Government motive.

THE COURT: Sustained. There's no evidence about what you're testifying about -- arguing about.

MR. DOUGLAS: The Government has told you -- the Government's representative in this courtroom has told you that they want to stop Paul Little. Because by stopping

Paul Little, they will stop Max Hardcore. And that is their only goal. They do not want to stop the shipment of this material generally into the Middle District of Florida.

How do we know that? Because from the time that Agent Fottrell downloaded the materials, 14 months went by. After Agent Walker had the materials shipped to them, James Komurek and Jaded continued to ship that. They continued -- they shipped it last year, last month, last week, they're shipping it today, they'll be shipping it tomorrow.

The Government has endorsed this by putting this witness on the stand, by not prosecuting him, even after Mr. Komurek said he's going to continue to ship it until there's a conviction and some lawyer tells him to not do it anymore.

But other than that, he's perfectly comfortable with that, and the Government is perfectly comfortable with him doing that.

This is absurd, but it serves the function. The function is to stop Paul Little.

Why?

(Pause.)

I have argued the Government doesn't care about the specifics of the crime. They certainly don't know or care about the elements of the offense. They care about

stopping Paul Little.

Therefore, it should be no surprise to you that they also don't care that he never sold the material to the Middle District of Florida, and never shipped the material to the Middle District of Florida.

There's really -- other than that extraordinarily strange inability to distinguish between fiction and reality, there's only one other statement made in the closing argument of the Government that I need to remind you, and remind you is absolutely factually wrong and contrary to the evidence.

I believe what was said is that Agent Walker bought from catalinaxxx and pissedonpornstars.com. That is absolutely inconsistent with all of the evidence, including the evidence of Agent Walker. She bought those materials from Jaded Video.

Now, the Government has discretion who to prosecute. They can prosecute Jaded, JKG, Komurek, or they can prosecute Paul Little, or both. When he says stop Paul Little and stop Max Hardcore, it is an effort to get the material banned.

And they are willing to sacrifice anything to get to that, including all the basic rules of fairness, the basic elements of the offense, in order to get the ban and to get a conviction of Paul Little.

Now, when this case began, before the case, during the case, if someone had asked you in the course -- in the -- in the case of this fact scenario, movie maker makes movie, sells it to retailer; retailer picks where and how to sell it to a particular location that ultimately is determined to be a crime for that mailing into that location.

And you were asked, who has greater guilt? Who has greater culpability? There's no question that you would say, the person that did it. The person that chose the location, and the person who chose the means, that are the components of the crime.

The Government justifies that choice by saying that the movie maker, Paul Little, could have stopped it by telling Jaded, don't ship to the Middle District of Florida.

This makes no sense.

Again, I'll ask you to tax your cultural memories. Does anyone remember the Music Man? A musical comedy?

Am I going to talk to myself when I say it?

Smiles there?

Okay, I'll assume that some of you know.

The song in the Music Man, the credo of the salesman, you got to know the territory. Who knows the territory? The movie maker or the person that sells to the community?

Who is more likely to know what the community standard is? James Komurek, and Jaded Video, that sell, that see sales records, that know what's popular, what's not popular, what's in enormous demand? Or the person that makes the movie?

There's no question what the answer is. The knowledge, the basis for the knowledge resides not with Mr. Little, but with Mr. Komurek. But the Government's giving him a free pass.

You know, when he said, I'm going to continue to sell it until there's a conviction and somebody tells me there's a conviction and tells me to stop. Safe to say that if that option were given to Mr. Little, you can continue to do it with a guaranteed free pass from the Government until someone else is convicted, and then you have to take all necessary steps to stop it. It's a pretty safe bet that he would prefer that option to the one he's been given now.

(Pause) (12:40 p.m.)

When the decision is made to stop Paul Little -- ignoring Komurek and their culpability -- with complete disregard and contempt for whatever the evidence is about the community standards of the Middle District, they're not only being contemptuous of that, they're being contemptuous of that essential component of the Constitution that's reflected in the portion of the jury instruction that

Mr. Sirkin read to you, they're contemptuous of the law, and they're contemptuous of you.

These lawyers have been ordered to prosecute Paul Little, and not JKG, and not Jaded. Even though JKG, Jaded, is the one that committed the crime -- if a crime was committed -- of the mailing to the Middle District, and Paul Little didn't.

You know, it is lawful to -- to film a crime. It's lawful to film a homicide. Not a fictional homicide, not -- not an Arnold Schwarzenegger movie, but an actual murder. Perfectly lawful to film it. And it's perfectly lawful to then go about showing that film. It's lawful to sell it, there's no restriction.

There is something fundamentally wrong with the fact that sex acts that are lawful to do, may not be, after they are filmed, sold; that they are subject to criminal prosecution, even though the underlying acts themselves are perfectly lawful.

There's something fundamentally backwards about that, and part of the outrage that I feel and hope to inspire in you.

Mr. Sirkin said it, it bears repeating. No one in America is forced to see these movies. Except you. Except the jurors. Everyone else makes that choice. The Government has said that the choice was made by Mr. Little.

That is fundamentally incorrect. The choice was made by the Government.

If Paul Little actually committed a crime, we wouldn't be here. If he knowingly employed underaged people, we wouldn't be here. You know he didn't do that. The Judge told you that, told you that twice, read to you from -- from the jury instruction on page 16. There's no claim that 2257 was violated, no claim that anyone was underage.

No one was working without prior consent and knowledge of exactly what was going to happen. Melissa Nicolleti told you that. Everybody knew, everyone was willing, everyone was paid, and paid well.

There was no crime. The five DVDs that are charged are not obscene. The five trailers are really not obscene. I mean, when you compare what the trailers are, the trailers represent a -- a ludicrous distillation of those movies.

There's -- there's Looney Tunes music playing in the side. The -- the acts are played fast-forward, reverse, back and forth.

It's -- the idea that that 30-second silliness could be declared obscene is itself ludicrous.

This prosecution is wrong. This prosecution stinks. I bear no rancor to the attorneys over there, they

are simply doing their job as ordered, they're dedicated lawyers doing their job.

But you do not have to buy into this miscarriage of justice, and I'm confident that you won't.

Paul Little will walk out of this courtroom a free man not because of the efforts of his lawyers, but because of you in your commitment to the law and the commitment of what makes America what we want it to be.

Go find him not guilty, and I thank you very much.

THE COURT: Mr. McAndrew, in rebuttal.

MR. McANDREW: Thank you, Your Honor.

(Pause.) (12:44 p.m.)

There are -- there are a number of points that I'll try to take up, uh, and I may need to grab a couple of exhibits in order to do it, but I would like to start with what Ms. Kinsley talked about.

Uh, she brought up a number of points about the documents, and I want to go back to those and talk a little bit about that.

Uh, she took bits and pieces of certain documents. And if we've learned anything in this case, it's that you've got to take something as a whole. Uh, so look at those documents as a whole.

And if you do, starting with number Ten. I think she pointed out to you, uh, on page two, uh, some

information -- I'm not sure which page it was, actually -- some information about when the account opened.

You see, the account closed -- you may not be able to see that -- in November of 2006. That is, this account was open during the time period in which the investigation of the website, January of '06, occurred.

Uh, so, to say that, you know, a document showing that the account opened in 2003 somehow doesn't prove that the account was still open in 2006, uh, really doesn't make sense when you look at the whole document.

Now, she also pointed out the jury instructions to you.

Could I have those?

There you go.

And she mentioned page 13 of the jury instructions, and how that defined, uh, the statute, Section 1461. Uh, she was talking about whether the issue of "knowingly" was sufficiently proven here. And, you know, you need to look at page 14.

Uh, page 14 of the instruction specifically defined for you what "cause" means in this statute. To cause the mails to be used is to do an act with knowledge that the use of the mails will follow in the ordinary course of business, or where such use can reasonably be foreseen.

That's what I was talking to you about. That's

where it is in the instructions. You need to read all of the instruction and not take bits and pieces. Consider them as a whole.

Now, she also talked a little bit about the purchase orders and the fact that Jaded was using UPS, or wanted to use UPS to get the videos from Max World Entertainment.

That's not necessarily unusual to me. You've got a distributor going to the producer and saying, get me the video, I need it quickly, I have a customer.

But then that distributor is going out to the customer -- and maybe they're not interested in picking the most expensive, or a more expensive means of sending it to the customer, unless, of course, the customer wants to pay for that, and you may have had that experience. You're allowed to use your common sense in this case.

Uh, have you bought something online where you've been given a choice of delivery options? You can pay more to get it faster? Well, maybe the business didn't want to assume the cost of paying more.

Now, there are a number of other points, and I'm just going to sort of run through them in order, uh, but one thing to be clear on here, ladies and gentlemen, the Government didn't put Paul Little's website next to your courthouse. He did.

And the Government brought the case here, quite frankly, because we couldn't find a closer courthouse. That one's about a block -- that building is about a block-and-a-half away, and this is the closest one we could find.

(Pause.)

Was the use of the mail foreseeable? There are only so many ways you can send things, ladies and gentlemen. You've got UPS, you've got DHL, you've got FedEx, you've got the Postal Service. There aren't that many ways to send it.

Don't people use different means at different times? Is it really their view that he couldn't possibly, or even reasonably have foreseen that the mails would be used?

Does that make any sense to you?

(Pause.)

Ms. Kinsley also mentioned that Jaded is still sending these materials to this jurisdiction. I don't believe there's any evidence in the record on that.

The evidence is that Jaded and Mr. Little's website, uh, continue to be linked and continue in their distribution relationship today. But there's no evidence that Jaded's still selling these particular videos, the ones that are charged, today.

As to the immunity issue with Jaded. Look at the

letter. Read it over. That's not an open-ended deal. And it doesn't let Jaded off the hook for distributing videos all over the place.

It let's Jaded off the hook for the five DVDs that are at issue in this case, and only insofar as the evidence that would be used would be based on his testimony or the documents he produced. That's it and nothing more.

Jaded isn't off the hook

Now, as to Mr. Charmatz, they again say Mr. Little had no idea, uh, that the -- that his website -- that he put his website in Tampa. Well, he only had one office, and the company was hosting his website for years before January of '06, and he was paying by check.

Do you really believe that he had no idea?

Mr. Sirkin brought up to you that the Government has to prove to you that it's obscene. Certainly it's the Government's burden. But the Supreme Court has been very clear, the Government does not need to present expert testimony that something is obscene.

Why? Because it's up to you. You watch it, you look at it and you decide. That is the essence of an obscenity case.

For me to come here -- I have to tell you, this is my first trip to Tampa, I've never been here before. For me to come down here and tell you what the standards are in

your community, I think, would be insulting. I think it would insult your intelligence.

You all have lived here a long time. You know an awful lot better than I do. I'm not even sure where the grocery store is. I'm not here to tell you what your community standards are.

Now, contrast that with what the defense has done in this case. They hired Dr. Brannon, they paid him $3,500 and brought him across the state for him to tell you that this material doesn't appeal to an unhealthy interest in sex.

I think Mr. Sirkin may have even said at one point that this is normal, this is healthy. Well, you get to decide that. Uh, what I think really doesn't matter. What he thinks really doesn't matter. In fact, what the Court thinks, respectfully, doesn't matter. It's up to you, ladies and gentlemen. You get to decide

That is one of the greatest things about these types of cases, is that not only are you in a position to making fact-finding, like all jurors are, but this one is really up to you.

For us to tell you what your standards are; to come here from Washington, D.C. and tell you what should be acceptable in your community is not right. It's insulting, and we wouldn't do it.

The other point I would note, as I say, we brought down Jim Fottrell from Washington. That's true, that's where he works. That's where we all work. They're from Cincinnati.

MS. KINSLEY: Objection, Your Honor.

MR. SIRKIN: Objection, Your Honor.

THE COURT: Sustained. There's no evidence to that effect.

MR. McANDREW: Okay.

The other point that I thought I'd hit on is this bit about, uh, how we all get to make choices, and this is a case about making choices. We do all get to make choices. That's one of the great things about our country, we get to make choices. But that's only half of the equation, ladies and gentlemen.

As one of the Judges in my Court is very fond of saying, life is about making choices and living with the consequences of those choices. There are consequences for what each of us do every day. We make tons of choices every day.

And the reason that is is because our choices affect other people. We're not living in a vacuum and we don't get to do whatever we want. We need to consider other people.

Is making a choice a political statement?

Sometimes, sure. Supporting a candidate can be. Taking a position on an issue can be. We're in a political season right now. But if you go out and distribute drugs, is that a political statement?

If you conspire to put false information into the stock market to fix the price of a stock, are you not guilty of fraud because you've made a political statement? If you choose to buy airline tickets and fly away from here to free your mind, is that a political statement?

If you choose to buy coffee in the morning before you come to court, is that a political statement too? Political speech is entitled to the highest protection under the First Amendment. Obscenity is entitled to none. They are not the same thing.

Now, Mr. Sirkin said at one point that the Government decided what to show you. We did. We made a decision on what we thought you needed to see. They showed you the rest.

But let me ask you this: Did it get any better? Did it make a difference to you? Was there some remarkable lightbulb moment where you went, oh, now I see the point? Now it's clear to me? He wants me to vote for Obama. Or, he thinks we need to lower taxes. Or anything else for that matter. It was a same stuff over and over again. We just didn't feel the need to show you all of it.

Ultimately ask yourselves, did it change your view on the material? Consider it all. That's the test. But did it change your view on the material? Did you find value after the eighth hour?

You were also told that we need to tell you what the standards are that you need to decide this upon. That's not the law. You decide what the standards are for your community.

You've lived here, you know the other people who live here, and you've got to figure out what the average person here would think of this and whether it's acceptable. It's not up to the Government, it's not up to the defendant, it's not up to the Court, it's up to you.

Mr. Douglas pointed out that there are a number of sites, uh, available on the internet, and I asked a couple of questions of that witness and, you know, whether or not those sites were actually hosted here in Tampa, like Mr. Little's. He didn't know.

Uh, I asked him whether he knew how many people in Tampa had access to those sites. He didn't know that either. Uh, but I find it amazing that these folks come in here and tell you that, well, because there are this number of sites, that means they're more popular than everything else.

They're telling you that a urination video is more

popular in Tampa than John Gruden? Is that the standard, folks? Do you believe that? Do you want to follow that?

Are those videos more popular than Tim Tebow in the State of Florida? I don't know, that's up to you. I'm a huge Rolling Stones fan. Assuming they're right, I at least took some solace in the fact that we still the Stones.

On the First Amendment, it's been clear, it doesn't protect speech or expression that is obscene. That makes sense. Think about that. We want to protect speech that has value, that has meaning; that adds something to our society.

One's freedoms in general end, whereas actions have a significant adverse effect on others, because we're all free. And when you go too far, you might start infringing on someone else's rights.

So here, where the freedom is used to communicate something that's really about an unhealthy and degrading interest in sex, it's patently offensive and has no serious value to our society, it's not protected. You can talk about consent and choice and everything else as long as you want, but it's not protected.

If you want the protection, you have to contribute something meaningful. It would be a perversion beyond what you saw in those videos for the First Amendment to be construed in such a manner as suggested by the defense

counsel.

Mr. Little does violence to the First Amendment and to the ideals of freedom much the way he acts in his videos.

Our freedoms are not free. They come with a price, ladies and gentlemen. The people who wrote the Constitution and the First Amendment paid a price. People who defend our country pay a price. We have standards that give our freedoms meaning, and ensure that others can exercise their freedoms without undue infringement.

Without standards, it's anything goes. It's chaos, it's anarchy. And who's going to protect the person being violated by the other one exercising his rights to freedom?

As American and as members of local communities, there are things that we do, there are things that we will do, but there are also things that we won't do. Those are our standards. It's as plain as the difference between right and wrong. You don't need me to tell you what the standards are. You know it through your own life experience. You know it through your many years in the community. You know it from how you interact with one another. You know it from how you treat one another.

At some point the citizens of the community need to stand up and say, we respect everybody's rights, but this

goes too far. Today's that day for you, and you have to do it for all members of your community.

It has been our honor and responsibility to speak for the United States in this case. It's your duty to speak for your community. Whether Paul Little's DVDs and website videos are acceptable to your community is totally up to you. We respectfully hope you bring back a verdict of guilty on all counts.

Thank you. (1:00 p.m.)

THE COURT: All right.

Ladies and gentlemen, I want to finish the jury instructions. There -- only have two left, and then I have a few general instructions for you. But if you will turn to page 28.

Any verdict that you reach in the jury room, whether it's a guilty verdict or a not guilty verdict, must be a unanimous verdict. In other words, to agree to a verdict you must all agree, all 12 jurors must agree. Your deliberations will be secret, you will never have to explain your verdict to anyone or discuss your verdict with anyone.

It is your duty as jurors to discuss the case with one another in an effort to reach an agreement, if you can do so. Each of you must decide the case for yourself, but only after full consideration of the evidence with the other members of this jury. While you are discussing the case,

don't hesitate to reexamine your own opinion, change your mind if you become convinced that you were wrong. But don't give up your honest beliefs solely because the others think differently or merely to get the case over with.

Remember, that in a real way you're the judges here -- you're the judges of the facts. And your only interest is to seek the truth from the evidence in this case.

When you go back to the jury room you should first select one of your members to act as the foreperson of this jury. The foreperson will preside over deliberations and will speak for you here in court.

There is a verdict form -- actually, there is a verdict form for Mr. Little and a verdict form for Max World Entertainment, Inc. And I have the only copy up here, but I will send it back with you.

The verdict form -- and I'm only going to read Counts -- count -- two of the counts, so that I will give you a general idea of what the verdict form consists of. And the verdict form I'm reading now is Paul Little, but the verdict form is identical for Max World Entertainment.

Count One.

On the charge in Count One of the Indictment, that on or about January 18th, 2006, in the Middle District of Florida, defendant Paul Little knowingly used an interactive

computer service in and for affecting interstate commerce for the purpose of selling and distributing an obscene matter, that is, a video entitled me20europromo.wmv -- wmv, approximately 1:26 in length, through the website www.maxhardcore.com, in violation of Title 18, United States Code, Section 1465 and (2).

The jury finds defendant Paul Little:

Guilty. Not guilty.

And you have a line after each, and after you unanimously make a decision, then the foreperson checks either guilty or not guilty.

There's an identical question as to Counts Two through Ten. Now, obviously the wording differs a little bit because the charges in Counts Six through Ten are different than the charges in Counts One through Five. And the wording differs a little bit because the video names are different, and the video clips, or video files are different.

But essentially you are asked as to each of the counts, as to each of the defendants, to make a determination as to whether they are guilty or not guilty. And once you have unanimously made that decision, then the foreperson signs and dates the verdict form.

You'll take the verdict form with you, when you've reached a unanimous agreement then your foreperson will fill

in the verdict form, date it, and sign it and return it to the courtroom.

If you need to communicate with me at anytime, please write down your question and pass the note to the Marshal, who will bring it to my attention. You need to write it down and sign it. And I like you to also put the time on it, because that allows me to keep track of when you sent the question out.

Most of the time I will reconvene court in an attempt to answer your question, and do it with you and with everybody present, and on the record. If it's a question, can we take a 15-minute break? Then I might just write back an answer. And you don't have to, that was a bad example, because you don't have to ask me if you want to take a 15-minute break.

But I caution you not to -- not to verbally ask questions that might pertain to the case, either to the security officer or to me in court.

I also caution you with regard to any message or question you might send out, that you not tell me your numerical division, should there be a numerical division at that time.

Now, some general -- general things. It's about five minutes after one, and we have ordered lunch, and lunch should be in the jury room when you go back in there.

113

You're welcome to go get some Cokes downstairs on the third floor, if you want to do that, in the jury assembly room.

I would just caution you that if you break apart for any reason where maybe some of you leave the room, where some of you are in the room, stop your discussions. All 12 jurors should be in that room for you to have any discussions about this case.

So, if you need to take recesses, and recesses are fine, if you need to get up and walk around a little bit, that's fine, but just stop deliberations until such time as all 12 jurors are together.

The other thing I would tell you is that there's no time frame here. If it takes you past five o'clock, we can stay this evening. If you need to come back tomorrow morning, you can come back tomorrow morning. It's up to you. You take whatever time that you need in an effort to reach a verdict in this case.

Now, one of you is an alternate juror, and normally if I have a case that's going to take more than a day or two I pick an alternate juror, because a lot of times we have a juror that gets sick, or for some emergency reason, or some other reason, simply cannot continue in the service as a juror. If we didn't have the alternate juror then to step in, we would have to start the case all over again with 12 more jurors.

So always in an abundance of caution I pick at least one alternate juror. In your case, all 13 of you have remained throughout this trial. And so, the law only lets 12 jurors make a decision. In criminal cases only 12 jurors can deliberate and make a decision.

So it will maybe my -- your -- my happy duty or maybe my unhappy duty -- I'm not sure how the juror will feel about it -- to excuse the alternate juror. And Mr. James, you are the alternate juror in this case. So, in just a few moments I'm going to excuse you.

I do have a couple of things to say to you, and they relate to what I would like you to do for the remainder of the day, but I am going to excuse you, and you will be able to leave the courthouse.

Do you have anything in the jury room that you need to get?

MR. JAMES: Just a book or two.

THE COURT: Well, then, let me go ahead and tell you. You're welcome to leave, and leave the courthouse; I would ask that you not discuss this case with anyone, anyone in the hallways, anyone at home, anyone at work. Please don't discuss it with anyone from the press, not until such time as the jury reaches a decision in the case.

If we have your phone number -- and I'm assuming we do -- we will call you when that happens.

Also, I would just suggest that you can -- if you want to go back to work, that's fine, or if you go home, that's fine, just -- we need to know where to be able to get in touch with you. But please do not discuss the case with anyone.

MR. JAMES: Okay.

THE COURT: Thank you.

All right. I am going to ask Mr. Towson to conduct the jury to the jury room. And we'll send back the verdict forms and the evidence and the Indictment in the case.

And Mr. James, you may get whatever you need to get out of the jury room. Thank you.

THE BAILIFF: Rise for the jury.

(Jury out)

Be seated, please

THE COURT: If you would have a seat a minute and I -- I'll excuse you all too to go to lunch in just a second. But Ms. Santiago, have you been over the evidence with both sides?

THE DEPUTY CLERK: Yes, we have.

THE COURT: Okay.

And everybody's satisfied about what's in?

THE DEPUTY CLERK: Yes, ma'am.

THE COURT: Okay.

And you've prepared the redacted Indictment?

THE DEPUTY CLERK: I am going to, actually.

THE COURT: Okay, you need to go do that.

THE DEPUTY CLERK: I will.

THE COURT: Okay. I'm going to give you the verdict forms.

After you've prepared the redacted Indictment, you need to show it to counsel, too.

THE DEPUTY CLERK: I will.

THE COURT: I need to -- I know you probably don't want to think about this right now, but I need to ask you a couple of questions.

Should this jury return a verdict in this case, there is a forfeiture section, and the Government has submitted some jury instructions and also I believe a verdict form. So, I need to ask a couple of questions, and a good time to ask it is right now.

Should the -- and I believe you're seeking forfeiture of the home and three domain sites; is that right? Or domain names?

MR. McANDREW: I believe that's correct, Your Honor, yes.

THE COURT: Okay.

MR. McANDREW: Ms. Cream filed these papers, but I -- that's correct.

THE COURT: Okay.

Well, who's going to be doing the forfeiture?

MR. McANDREW: I think she's ultimately going to handle it. I think she may be out of town today.

THE COURT: Well, that's a problem because we're going to do it immediately when the verdict returns.

MR. McANDREW: Oh, well, then we'll handle it today.

THE COURT: Okay.

All right. Yes, it would be my intent if the jury finds Mr. Little and/or Max World Entertainment guilty, we would start immediately into the forfeiture. So that's why I'm asking the questions.

MR. McANDREW: All the evidence is in. Uh, I would anticipate maybe some argument just to explain the evidence.

THE COURT: Well, I was going ask that question.

Let me ask counsel for the defendants. Would you like a jury to consider the issue of forfeiture?

MR. SIRKIN: Yes.

THE COURT: Okay.

Then what we will do is immediately upon their rendering a guilty verdict -- if there is a guilty verdict -- we'll proceed with the forfeiture. So, let me ask you the same questions that I intended to ask the

Government. Do you intend to present any evidence, or simply argument?

MR. SIRKIN: I believe just argue it.

THE COURT: Okay.

And have you had a chance to look at the verdict form and the jury instructions submitted by the Government?

MR. SIRKIN: I have, but it's been -- it's probably been a week-and-a-half.

THE COURT: Okay.

Would you do so?

MR. SIRKIN: Yes. We have a copy -- I think I may have left it back at the hotel.

THE COURT: We can give you a copy. If you will do so.

And the final thing. I'm assuming Ms. Santiago has your phone numbers, and you're free to go eat lunch or do whatever you want to do, but make sure you can be back in about 15 or 20 minutes in case we get a question, or in case there is another problem.

MR. McANDREW: Thank you, Your Honor.

THE COURT: Okay.

And I would like one person from each side to remain, just so Ms. Santiago can show you the redacted Indictment so that you're satisfied that that's sufficient and correct before we send it back.

And we are in recess pending a verdict.

Ms. Kinsley, do you want the memorandum of law, as well, that the Government filed in support of the jury instructions?

MS. KINSLEY: Yes, please. We don't -- within our current possession we have nothing related to the forfeiture.

THE COURT: All right, we'll get that.

(Pause.)

Ms. Kinsley, look at this.

(Pause.)

MS. KINSLEY: Counts One through Five have the "and elsewhere" language.

THE COURT: Well, I don't know what to do about that.

MS. KINSLEY: It's in the instructions without it, so that's okay.

(Thereupon, the Court stood in recess at 1:16 p.m. awaiting the verdict of the jury.)

STATE OF FLORIDA )
COUNTY OF HILLSBOROUGH )

I, PAUL K. SPANGLER, Official Court Reporter for the United States District Court, Middle District, Tampa Division,

DO HEREBY CERTIFY, that I was authorized to and did, through use of Computer Aided Transcription, report in shorthand the proceedings and evidence in the above-styled cause, as stated in the caption hereto, and that the foregoing pages numbered 1 to 120, inclusive, constitute a true and correct transcription of my shorthand report of said proceedings and evidence.

IN WITNESS WHEREOF I have hereunto set my hand in the City of Tampa, County of Hillsborough, State of Florida, this 27th day of June, 2008.

S/PAUL K. SPANGLER

PAUL K. SPANGLER, Official Court Reporter